IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


```
------------------------------------------------------   .
MICHAEL W. HOUT, et al.,                    : CASE NO.  1: 04 CV 1127
                                            :
                           Plaintiffs,      :
                                            : MEMORANDUM AND ORDER
              -vs-                          : GRANTING SUMMARY JUDGMENT
                                            : TO DEFENDANTS THE CITY OF
                                            : MANSFIELD, ANGELO KLOUSIADIS
CITY OF MANSFIELD, OHIO, et al.,            : AND F.L. FISHER, DEFENDANTS
                                            : OHIO COUNCIL 8 AND LOCAL 3088
                           Defendants.      : OF THE AMERICAN FEDERATION OF
------------------------------------------------------   : STATE, COUNTY AND MUNICIPAL
                                              EMPLOYEES, AND DEFENDANT
                                              CARLINE CURRY ON THEIR
                                              SEPARATE MOTIONS.
```


UNITED STATES DISTRICT JUDGE LESLEY WELLS


Defendants City of Mansfield, Ohio ("the City"), Angelo Klousiadis, and F.L.

Fisher (the "Mansfield Defendants") (collectively "City Defendants"), defendants

American Federation of State, County, and Municipal Employees ("AFSCME") Ohio

Council 8 ("Ohio Council") and AFSCME Local 3088 ("Local Union") (collectively "Union

Defendants"), and defendant Carline Curry ("Ms. Curry") motion separately for summary

judgment on all claims against them contained in the Plaintiffs' Second Amended

Complaint.  The Plaintiffs are Michael W. Hout ("Mr. Hout"), Jeff Gibson ("Mr. Gibson"),

Troy Benick ("Mr. Benick"), Peter Neumann ("Mr. Neumann"), Lewis A. Workman ("Mr.

Workman"), Tyler Merritt, Jr. ("Mr. Merritt"), and Miles H. Jessee ("Mr. Jessee")

(collectively "Plaintiffs").

In their Second Amended Complaint the Plaintiffs, employees for the City of Mansfield's Waste Water Treatment Plant ("WWTP"), level claims against the City Defendants of (1) race and sex discrimination under Title VII, 42 U.S.C. § 1981, and Ohio Revised Code ("O.R.C.") § 4112; (2) retaliation in violation of Title VII; (3) race and sex harassment and hostile work environment. The Plaintiffs also assert derivative state claims of intentional inflection of emotional distress, negligent supervision and negligent retention.

The Plaintiffs also bring claims against Defendants Ohio Council 8, American Federation of State, County and Municipal Employees, AFL-CIO and Local 3088, American Federation of State, County and Municipal Employees, AFL-CIO (collectively "Union Defendants")[1] alleging: failure to adequately and fairly represent them by refusing to file, or in the presentation of grievances asserting claims of discrimination; failure to fairly represent them over claims of discrimination against their supervisor in violation of Title VII, §1981, and O.R.C. Chapter 4112; direct sex and race

---

[1]While the Court will use the nomenclature of "Union Defendants" to identify the AFSCME Ohio Council 8 and AFSCME Local 3088, upon the Plaintiffs' own terms and the standards set forth in Alexander v. Local 496, LIUNA, 177 F.2d 394 (6th Cir. 1999) (Pls. Doc. 163 p. 12), the Court will not find the Ohio Council vicariously liable for the Local Union's alleged actions on the following three grounds. First, the Court has before it no evidence of an agency relationship between the two Union bodies. (Miller Dec. ¶¶ 2-5). Second, the Court has before it no material evidence either that Plaintiffs requested participation of the Ohio Council body in any grievance procedure, or that the Ohio Council body was involved in any of the Plaintiffs' grievance processes other than Step 3 hearings. (Miller Dep. 7-10, 87, 99-100). Third, the Court has before it no material evidence that the Ohio Council body condoned the Local Union's alleged refusal to file grievances regarding the alleged discrimination against the Plaintiffs by the City and Ms. Curry. (Miller Depo. 44-55, 78-93).

discrimination; hostile work environment; retaliation; intentional infliction of emotional distress; and defamation.

Further, the Plaintiffs' Second Amended Complaint levels six claims for relief against "Ms. Curry".  The Plaintiffs assert the following claims: (1) sex discrimination under O.R.C. 4112, 42 U.S.C. § 1981, 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, as amended by the Civil Rights Act of 1991 ("Title VII"); (2) race discrimination parallel to, and based upon, the same statutes as the claim of sex discrimination; (3) retaliation; (4) harassment and hostile work environment based on sex and race in violation of Title VII and O.R.C. § 4112; (5) intentional infliction of emotional distress; and (6) slander.

For the reasons discussed below, the Court will grant the several Defendants' Motions for Summary Judgment and dismiss the Plaintiffs' claims in their entirety as a matter of law.

## I.      BACKGROUND

**Waste Water Treatment Plant Structure and Personnel**

The City of Mansfield has approximately twenty employees working at the "WWTP" engaged in the maintenance, operations and supervision of the plant and its personnel.[2]   Plant Manager Angelo Klousiadis possessed supervisory responsibility for

---

[2]Upon review of the depositions and further declarations of Plaintiffs Benick, Merritt, Gibson, Workman, Neumann, and Hout in support of the Plaintiffs' oppositional brief to the Union Defendants' motion for summary judgment, the Court will grant the Union Defendants' motion to strike the named declarations.  (Doc. 178).  In comparing the depositions and later supplied declarations for the six named Plaintiffs in this particular pleading, the Court finds

WWTP functions and reported to the Director of Public Works, F.L. Fisher ("Fisher").

Operations Supervisor Otto Kulda ("Kulda") and Maintenance Supervisor Edward

Lemaster ("Lemaster") supervised, respectively, the operations and maintenance

activities of the WWTP.  Plaintiffs Klousiadis, Fisher, Kulda and Lemaster are all white

males.

Ms. Curry works the day shift from 7:00 a.m until 3:00 p.m. as a Pretreatment

Coordinator in the City of Mansfield's "WWTP".  The position she holds is as a first-line

supervisor responsible for managing the collection of waste-water samples taken by two

sampling-aides.  (Klousiadis Dec. ¶¶ 1, 2).  During much of the time-period covered by

this suit, Ms. Curry was the only African-American and the only female employee at the

WWTP.  Ms. Curry has worked full-time at the WWTP since 1981 and has performed

the job of Pretreatment Coordinator since her promotion in 1984.  Part of Ms. Curry's

job responsibilities included supervising the performance of Plaintiffs Troy Benick and

Jeff Gibson.  Mr. Gibson began work at the WWTP in 1994, while Mr. Benick began

work at the WWTP in 2001.

Four of  the plaintiffs – Michael Hout, Miles Jessee Tyler Merritt, and Peter

Neumann – worked the day shift at the WWTP, in Operations, and were directly

supervised by Robert Coker.  A fifth Plaintiff, Lewis Workman, worked on the WWTP's

the declarations so replete with statements inadmissible as to be unsalvageable.
The declaratory statements do not meet the strictures of Rule 56(e) due to the
presence of hearsay and conclusory statements, because other statements are
lacking in personal knowledge and specific fact, and because some statements
are directly contradictory pursuant to the Sixth Circuit's decision in Aerel SRL v.
PCC Airfoils LLC, 448 F.3d 899 (6th Cir. 2006).  Finally, by containing previously
undisclosed but requested discovery the declarations will be stricken as failing to
adhere to the preclusionary requirements of Rule 37(c).

third shift , from 11:00 p.m. until 7:00 a.m. Mr. Workman had only occasional

interactions with Ms. Curry. (Workman Depo 29-30, 33-34). In addition, as the

evidence indicates, Ms. Curry occasionally supervised the work of Plaintiffs Hout,

Jessee, Merritt, Neumann, and Workman, on the rare instance the WWTP needed

sampling aides to fill in for Benick or Gibson, or to perform overtime work. Otherwise,

Ms. Curry's office is located in the WWTP building apart from the five Plaintiffs not

under her supervision and their paths rarely crossed.

### Polices and Procedures of the City and the Union Defendants

The Plaintiffs belonged to and were represented by AFSCME Local 3088 ("Local

Union") affiliated with AFSCME International in Ohio. AFSCME Ohio Council ("Ohio

Council") is a statewide servicing council for over 400 local unions affiliated with

AFSCME Int'l. The evidence indicates that the Ohio Council and the Local Union are

separate legal entities. (Miller Dec. 2-4). Brad Miller ("Miller") was employed by the

Ohio Council and participated in labor negotiations, labor-management meetings,

presented arbitration cases on behalf of the Local Union and attended Step 3 grievance

procedures if requested.[3] During the period under consideration here, Dale Blamer

("Blamer") has been either President or Vice President and Chief Steward of the Local

---

[3]The Collective Bargaining Agreement ("CBA") between the Local Union and the City set forth a four step grievance and binding arbitration procedure. Step One required an employee to present the grievance to his or her immediate supervisor. Step Two allowed the Local Union or the grievant to appeal the City's written response if not satisfied. Step Three allows the same appeal rights for both the Local Union and the grievant. Step Four leads to binding arbitration, a step which can be appealed to only by the Union and not the represented employee. At Step Four the Union Council presents the grievance at arbitration on behalf of the Local Union. (Miller Dec. 6-11).

Union, while John Van Harlingan (Van Harlingan") served as the President of the Local

Union.

Both the City and the Union Defendants have policies and procedures on non-

discrimination.  The City's Policy and Procedure Manual requires claims of

discrimination be reported to the City EEOC Officer for investigation.  In addition, the

City's policy against work place violence requires employees who experience threats of

violence to immediately report the incident to their department head.  The CBA prohibits

the City from engaging in discrimination on the basis of race and sex with respect to

wages, hours or other terms and conditions of employment.  Progressive disciplinary

action for violations involve: informal conferences, written reprimands, suspensions

without pay, reductions in pay or position, and termination.  (CBA Article 8).  The CBA

establishes a Health and Safety Committee to make recommendations but contains no

right to grieve health and safety issues.  (Miller Dec. 7, 12-13; Van Harlingen 46).

**Allegations of Threats by Ms. Curry**

A series of events in the Fall of 2003 led the City to place Ms. Curry on paid

administrative leave during the course of an investigation by the City and the Mansfield

Police Department over the question of whether Ms. Curry had violated the City's policy

regarding violence in the workplace.  The evidence indicates that Plaintiff Jessee

alleged Ms. Curry told him, "I'm going to go home and get a gun and blow your fucking

head off."[4]  In August 2003 Mr. Gibson alleged that Ms. Curry was threatening to shoot

people.  The evidence indicates that Mr. Gibson was referring to a comment made by

---

[4]Mr. Jessee later testified that Ms. Curry did not utter this statement.
(Jessee Depo. 2).

Ms. Curry during a meeting with all WWTP employees when she asked if anyone knew where her house keys were.  When Plaintiff Merritt gestured as if to indicate he had her keys, Ms. Curry retorted that if anyone entered her house she would shoot them. (Blamer Dec. 14).  Evidence also indicates that Mr. Benick had taken personal notes of Ms. Curry's remarks in the Fall of 2003 when she believed that employees had vandalized her car and office, had taken her keys and moved her personal belongings. On those occasions, Ms. Curry allegedly said she was going to shoot whomever was interfering with her personal property.  Evidence indicates that Mr. Benick did not share his personal notes with the City Defendants or the Union Defendants until discovery in the instant matter.

In the Fall of 2003, Plaintiffs Gibson, Benick, Merritt, and Jessee met with Plaintiffs Van Harlingen, Blamer, Klousaidis and Fogt to discuss Ms. Curry's alleged yelling and threatening employees with "write-ups."  Mr. Fogt then met with Ms. Curry. Evidence indicates that later that day, in the presence of Plaintiffs Benick and Gibson, Ms. Curry asked WWTP employee Ted Lee if he was intimidated by her and gestured toward him with her hand in the shape of a gun.  This incident was reported to Mr. Blamer who reported it to Mr. Klousiadis.  (Blamer Dec. 16).

In late November 2003, evidence indicates that one of the Plaintiffs called Mr. Van Harlingen to report that employees at the WWTP were afraid that Ms. Curry might be carrying a gun to work.  (Van Harlingen 32).  The evidence shows that Mr. Van Harlingen asked for, and received written statements from Plaintiffs Jessee, Benick, Gibson, and Hout regarding these allegations.  Mr. Van Harlingen and Mr. Miller then met with Mr. Fogt, whereupon the City asked the Mansfield Police Department to

-7-

conduct an investigation.  (Van Harlingen 34; Miller 18).  Evidence indicates that after the conclusion of the police investigation the City reported to the Local Union that Ms. Curry's car and bag had been searched and further questioning had produced insufficient evidence of a criminal offense.  In addition, the police interview transcripts indicate that Plaintiffs Hout, Neumann, Gibson, Benick and Workman each testified to the Mansfield police that they had never been directly threatened by Ms. Curry.

The City conducted its own internal investigation.  The City held a pre-disciplinary hearing on the charge that Ms. Curry had violated the City's violence in the workplace policy.  The City found no evidence to support the charge and Ms. Curry was returned to work.  Evidence indicates that the Local Union requested the City perform diversity training for WWTP employees, which the City conducted a few weeks after Ms. Curry's return on 12 January 2004.  Further evidence indicates that since her return, none of the Plaintiffs have reported to the Union Defendants any claims of physical threats of violence towards them by Ms. Curry.  (Neumann Depo 104-06; Jessee Depo 64; Benick Depo 418-19; Merritt depo 455-56).  Two weeks after Ms. Curry's return, evidence indicates that the Plaintiffs sent a joint letter to the Local Union asking what it intended to do to protect them from threats made by Ms. Curry.  Mr. Van Harlingen responded in writing to the Plaintiffs that he would "be happy to pursue the matter" in the form of a grievance with documentation of dates, times and witnesses.  (Van Harlingen 41-43).

Evidence indicates that Ms. Curry was suspended for one day without pay for confronting Plaintiffs Gibson and Benick during the work day on 6 May 2004 when she was off duty.  In the confrontation, Ms. Curry demanded Benick and Gibson explain the statements they had made to the Mansfield Police during its investigation.

-8-

While neither Plaintiffs Benick nor Gibson were disciplined by Ms. Curry, upon her return there was continued tension which, evidence indicates, Mr. Klousiadis sought to alleviate by issuing new Pretreatment Procedures.  (Klousiadis 15).  The directive limited Mr. Benick and Mr. Gibson's contact with Ms. Curry and narrowed Ms. Curry's supervisory authority, requiring that:  Ms. Curry provide written daily work assignments to Mr. Gibson and Mr. Benick each morning; Mr. Benick and Mr. Gibson would leave the plant for field work no later than 7:30 a.m.; no discipline would issue on the basis of work performance unless Mr. Kulda concurred and he would make himself available during the course of the day to answer questions regarding Mr. Benick's and Mr. Gibson's work performance.

Mr. Klousiadis' directive also required Ms. Curry to perform her work in her private office and outside of the Pretreatment Room which had become a gathering place for employees.  Evidence indicates that Ms. Curry was suspended without pay for one day for failing to follow the directive to perform her work in her private office.

The City also implemented new work rules for all WWTP employees.  These rules included: new sick leave usage rules; restricted employees from talking to one another about non-work related matters on the job; restricted the use of personal cell phones while on the job; and prohibited employees from tape recording each others conversations on the job.  The Union Defendants grieved the new policies and the City rescinded the new sick leave rules and retained the other restrictions.  On 3 November 2005, the Plaintiffs signed a petition asking the Local Union to file an unfair labor practice charge against the City for implementing these rules.  The Ohio Council legal department denied the request upon review.  (Van Harlingen Dec. 50-51).

-9-

**Workplace Treatment of the Plaintiffs**

Between 1999 and 2005, Mr. Gibson received six informal conferences for work related performance from his supervisor Ms. Curry.  Mr. Gibson received a written reprimand for leaving a sampling stainer in a sewer line in March 2005 and a one day suspension without pay for failing to begin work in the field as directed in June 2005. During this same period, evidence indicates that Mr. Benick received two Informal Conferences from Ms. Curry.  (Van Harlingan Dec. 28).  After the City's implementation of the new Pretreatment Procedures in July 2004 all disciplinary action toward Mr. Gibson and Mr. Benick was the result of a joint finding between Mr. Kulda and Ms. Curry.  (Curry Depo. 270-78).  Under the auspices of the new Pretreatment Procedures, Mr. Benick was suspended for a total of thirty-four days as the result of the City's progressive disciplinary policy.  Each of these disciplinary actions related to work performance or violation of City policy, such as when Mr. Benick was suspended for fifteen days for making unauthorized photocopies of City documents for his personal use.  (Benick Depo. 440-46, 502-04).  Evidence indicates that in three other instances Mr. Benick was charged and found not guilty of poor work performance involving the proper handling of equipment.  Following his last suspension of fifteen days Mr. Benick transferred out of the WWTP.

From 2003 to 2006 the Local Union filed ten grievances against Ms. Curry on behalf of Mr. Gibson, two involving alleged unprofessional behavior on the part of Ms. Curry and the remainder involving written reprimands for work performance.  (Blamer Dec. 10-12, 21).  During the same period, the Local Union filed six grievances against Ms. Curry on behalf of Mr. Benick involving allegations of Ms. Curry yelling at the

-10-

Plaintiff Benick about his work performance.  The Local Union also grieved each of Mr.

Benick's written reprimands and suspensions.  (Van Harlingan Dec. 29-31).

Mr. Merritt, who works the graveyard shift at the WWTP received two informal

conferences from Ms. Curry between 1981 and 2002.  Mr. Merritt was suspended for

one day in July 1996 for calling Ms. Curry a "bitch" among other obscenities.  Mr.

Merritt received discipline from his supervisor, Mr. Coker, on seven occasions and four

other disciplinary actions at the direction of Mr. Kulda.  Evidence indicates that each of

these actions involved work performance or violation of City performance.  In the most

egregious instances,  Mr. Merritt was charged in September 2005 with providing a false

statement to the City at a pre-disciplinary hearing where he was accused of reading

personal material while on duty.  (Merritt Depo. 98).  The City recommended termination

and through negotiation with the Union Defendants at Step Three of the grievance

procedure Mr. Merritt accepted a one-day suspension instead of the discharge.  Id. 105-

07.  In November 2005, the City again sought to terminate Mr. Merritt after he allegedly

failed to perform his duties and misrepresented his actions.  The Union Defendants

appealed the termination and,  in July 2006, an arbitrator found that Mr. Merritt had

failed to perform his duties, that he had engaged in a cover-up of his conduct, and that

while his conduct "clearly justified discipline being imposed," it was sufficient to reinstate

Plaintiff Merritt without back pay.  (Klousiadis Dec. 23).

Testimonial evidence from Plaintiffs Workman, Neumann, Jessee, and Hout

indicate they have not received any discipline from Ms. Curry.  (Workman Depo. 42-44;

Neumann Depo. 30-33; Jessee Depo. 33-34; Hout Depo. 18).  With regard to actions in

general against Plaintiffs Hout, Jessee, Neumann, and Workman, the four Plaintiffs

-11-

received a total of five informal conferences and two written reprimands for minor work

performance issues since 1995.  None of these actions resulted in the loss of pay,

position, or employment status.  The Plaintiffs did testify to alleged adverse

consequences with regard to their willingness to accept overtime duty in the

pretreatment facility.  (Workman Depo. 75; Hout Depo. 293; Jessee Depo. 47;

Neumann Depo. 35).

        With regard to the grievance activity of Plaintiffs Jessee, Workman, Neumann,

and Hout, the evidence indicates the following:  Mr. Jessee filed one grievance against

Ms. Curry in 1994, he filed a group grievance in 2005 over the implementation of the

new cell phone policy, and he did not approach the Union Defendants to grieve alleged

threats or other alleged conduct by Ms. Curry.  (Jessee Depo. 221-252).  Mr. Workman

admitted to grieving only for lost overtime.  (Workman Depo. 221-23).  His testimony

indicates that he never filed a grievance against Ms. Curry, that he did not inform the

Union Defendants of Ms. Curry's alleged threats or ask the Union Defendants to file a

grievance regarding any of her alleged conduct.  (Workman Depo. 225, 227, 232, 234).

Plaintiff Neumann testified that he has never filed nor asked the Union Defendants to

file a grievance against Ms. Curry for her alleged conduct.  Mr. Neumann testified that

he has not filed a grievance since 1997 except for the group grievance regarding the

new cell phone policy.  (Neumann Depo. 114-118, 130, 136).  Mr. Hout testified that he

requested the Local Union to file a grievance over the City's 2004 policy prohibiting the

use of tape recorders on the job.  The Local Union proceeded with that grievance

through Step Three but determined it did not have sufficient merit to warrant an appeal

to arbitration.  Mr. Hout also filed a grievance over a dispute about pay for his time as a

witness at a grievance hearing.  Mr. Hout admitted that he never asked the Union

Defendants to file grievances over alleged threat or conduct from Ms. Curry.  (Hout

Depo. 185, 187, 254-58).  The Union Defendants appealed the City's cell phone usage

policy to arbitration.  (Van Harlingan Dec. 48).


   II.     SUMMARY JUDGMENT STANDARD

   Summary judgment must be entered "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett,

477 U.S. 317, 322 (1986).  The moving party,

> always bears the initial responsibility of informing the district court of the
> basis for its motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file, together
> with the affidavits, if any," which it believes demonstrate the absence of a
> genuine issue of material fact.

Id. at 323;  see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir.1991) (moving

party has the "burden of showing that the pleadings, depositions, answers to

interrogatories, admissions and affidavits in the record, construed favorably to the

nonmoving party, do not raise a genuine issue of material fact for trial") (quoting

Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir.1987)).  The burden then shifts to the

nonmoving party who "must set forth specific facts showing that there is a genuine issue

for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quoting

Fed.R.Civ.P. 56(e)).  Thus, "[o]nce the moving party has met its initial burden, the

nonmoving party must present evidence that creates a genuine issue of material fact

making it necessary to resolve the difference at trial."  Talley v. Bravo Pitino Restaurant,

-13-

Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995).  Read together, Liberty Lobby and Celotex

stand for the proposition that a party may move for summary judgment by

demonstrating that the opposing party will not be able to produce sufficient evidence at

trial to withstand a motion for judgment as a matter of law pursuant to Fed. R. Civ. P.

56.  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989).

Once the burden of production has shifted, the party opposing summary

judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is

not sufficient to "simply show that there is some metaphysical doubt as to the material

facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986);

see also Michigan Protection and Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 341 (6th

Cir. 1994) (marking as standard that the plaintiff must present "more than a scintilla of

evidence in support of his position; the evidence must be such that a jury could

reasonably find for the plaintiff").  The nonmovant must "present affirmative evidence in

order to defeat a properly supported motion for summary judgment."  Id. (quoting in part

Anderson, 477 U.S. at 257); see Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).  The

nonmoving party "must present significant probative evidence in support of its complaint

to defeat the motion for summary judgment."  Moore v. Philip Morris Co., 8 F.3d 335,

339-40 (6th Cir. 1993).

Consequently, a nonmovant must do more than raise some doubt as to the

existence of a fact; the nonmovant must produce evidence that would be sufficient to

require submission to the jury of the dispute over the fact.  See Anderson, 477 U.S. at

248.  If the nonmovant fails to present such affirmative evidence, then there is no need

for a trial since there are no "genuine factual issues that properly can be resolved only by a finder of fact."  <u>Anderson</u>, 477 U.S. at 247-48; <u>see</u> <u>Celotex</u>, 477 U.S. at 322-23.

Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. <u>Celotex Corp</u>., 477 U.S. at 324.  Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'"  <u>Hancock v. Dodson</u>, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).


### III.    LAW AND ARGUMENT

#### A.  Statute of Limitations

In deferral states such as Ohio, § 2000e-5(e)(1) requires plaintiff to file a complaint with the EEOC within 300 days of the allegedly unlawful employment practice. <u>Amtrak v. Morgan</u>, 536 U.S. 101, 109-10 (2002); <u>see also</u>, <u>Alexander v. Local 496, Laborers' Intern. Union of North America</u>, 177 F.3d 394, 407 (6th Cir. 1999) ("[I]f the alleged unlawful practice occurs in a 'deferral state,' in this case Ohio, which has enacted its own laws prohibiting discrimination in employment, the plaintiff must file suit within 300 days of the alleged discriminatory act.").  The 300-day limitation period

-15-

begins to run" [o]nce the employee is aware or reasonably should be aware" of the allegedly unlawful employment decision, "not when the plaintiff learns that the employment decision may have been discriminatorily motivated."  <u>Amini v. Oberlin College</u>, 259 F.3d 493, 498-99 (6th Cir. 2001).

Pursuant to <u>National R.R. Passenger Corp. v Morgan</u>, 536 U.S. 101, 108-09 (2002), and notwithstanding the Plaintiffs' arguments (Doc. 163, p.  13), the Court determines the Plaintiffs may file suit on events that fall outside the 300-day limitation period for filing a charge with the EEOC only for events alleging "hostile work environment claims."  <u>Id</u> at 110.  Whether those events outside of the 300-day limitation, which fall within an allegation of a hostile work environment claim may be considered, hinges upon whether, pursuant to the 6th Circuit's decision in <u>Sharpe v. Cureton</u> 319 F.3d 259, 268-69 (6th Cir. 2003), the preponderance of the evidence establishes that "intentional discrimination against the class of which plaintiff was a member was the company's standard operating procedure."  Id.

For Title VII actions which are construed as "discrete discriminatory acts" such as "termination, failure to promote, denial of transfer, or refusal to hire," each of which "starts a new clock for filing charges alleging that act," the Court will exercise the 300-day statute of limitations from the date of Plaintiffs' filing with the EEOC.  <u>Morgan</u>, 536 U.S. 113-14.  Accordingly, with regard to the Plaintiffs' claims of "discrete discriminatory acts" against the Union Defendants, pursuant to Title VII, the Court will only consider alleged acts of discrimination by the Union Defendants occurring after 28 April 2004, as that date falls 300 days prior to the Plaintiffs' 22 February 2005 EEOC filing against the

-16-

Union Defendants.[5]  Similarly, the Plaintiffs allege filing their EEOC complaints against the City of Mansfield in March 2004.  Considering the Plaintiffs filed their EEOC complaint on 1 March 2004, the Court concludes that Title VII's statute of limitations has run against the Plaintiffs' claims against the City Defendants on any discrete acts of discrimination alleged to have occurred prior to 9 April 2003.

    **B.**    **Plaintiffs' Race and Sex Discrimination Claims Under Title VII, §1981, and O.R.C. Chapter 4112**

        **1.**    **Initial Determination of the Scope of the Claims: Individual Liability & Section 1981**

            **(i)**    **Title VII**

As an initial matter, the individual City Defendants are not subject to liability under Title VII.  <u>Wathen v. General Electric</u>, 115 F.3d 400, 404-05 (6th Cir. 1997)   (holding that an individual employee/supervisor, who does not otherwise qualify as an "employer," may not be held personally liable under Title VII).

Accordingly, neither the individual City Defendants nor Ms. Curry are liable under Title VII as these individuals are not employers as the term is defined under Title VII.  Mr. Fisher, Mr. Klousiadis, and Ms. Curry are entitled to summary judgment as a matter

---

[5]The court notes the Plaintiffs bear the burden of establishing the timely filing of their allegations of discrimination.  The Court finds untimely assertions stated in the following declarations: Benick Dec. ¶¶ 3,5, 7; Merritt Dec. ¶¶ 3,5,7,8,9,10; Neumann Dec ¶¶ 3-7, 11; Gibson Dec. ¶¶ 3,5,6,8; Hout ¶¶ 3, 10, 11.

of law on Plaintiffs' Title VII claims of race and sex discrimination, as well as Plaintiffs'

Title VII harassment/hostile work environment claim.

### (ii)    O.R.C. Chapter 4112

Under Ohio law, an individual employee may be liable for employment

discrimination.  Ohio Rev. Code § 4112; Genaro v. Cent. Transport, Inc., 84 Ohio St.3d

293 (1999); Cheek v. Indus. Power Coatings, Inc., 84 Ohio St.3d 534 (1999). In Genaro,

the Ohio Supreme Court noted:

> R.C. 4112.02 provides that "[i]t shall be an unlawful discriminatory practice:
> (A) [f]or any employer, because of the race, color, religion, sex, national
> origin, handicap, age, or ancestry of any person, * * * to discriminate
> against that person with respect to hire, tenure, terms, conditions, or
> privileges of employment, or any matter directly or indirectly related to
> employment." R.C. 4112.01(A)(2) defines "employer" as "any person
> employing four or more persons within the state, and any person acting
> directly or indirectly in the interest of an employer." (Emphasis added.)
> Further, the term "person" is defined very broadly by R.C. 4112.01(A)(1)
> as including "one or more individuals, * * * any owner, lessor, assignor, * *
> * agent, [and] employee." It is clear that the R.C. 4112.01(A)(2) definition
> of "employer," by its very terms, encompasses individual supervisors and
> managers whose conduct violates the provisions of R.C. Chapter 4112.
>
> Moreover, R.C. 4112.08 mandates that "[t]his chapter [4112] shall be
> construed liberally for the accomplishment of its purposes . . . .

Genaro, 84 Ohio St.3d at 296. See also Cheek, 84 Ohio St.3d at 534 (Ohio 1999)

(holding that "an individual employee, not otherwise deemed to be an 'employer' under

the statute, may be individually liable for alleged violations of the employment

discrimination provisions of the Ohio Civil Rights Act, Ohio Rev.Code §§ 4112.01(A)(2),

4112.02(A) & 4112.99").  Ohio courts have refused to extend Genaro to non-supervisory

-18-

employees.   See Hale v. City of Dayton, No. 18800, 2002 WL 191588, at * 2 (Ohio Ct.

App. Feb.8, 2002) (unpublished disposition).

Accordingly, the only claim of sex discrimination and harassment/hostile work

environment to survive, at this juncture, against the individual defendants – Mr. Fisher,

Mr. Klousiadis, and Ms. Curry – does so under O.R.C. Chapter 4112.


### (iii)    Plaintiffs' Claims Under 42 U.S.C. §1981

Plaintiffs first raise several claims under §1981, which provides:

> [a]ll persons within the jurisdiction of the United States shall have the same
> right in every State and Territory to make and enforce contracts ... as is
> enjoyed by white citizens, and shall be subject to like punishment, pains,
> penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  While §1981 does not expressly afford a cause of action to private

parties, the United States Supreme Court held in Runyon v. McCrary, 427 U.S. 160, 96

S. Ct. 2586, 49 L. Ed. 2d 415 (1976), that private defendants may be held liable under

its provisions.  Id. at 174-175.  Plaintiffs' claim that §1981 contains an implicit cause of

action against municipalities that engage in racial discrimination in employment.  In Jett

v. Dallas Indep. Sch. Dist., 491 U.S. 701, 109 S. Ct. 2702, 105 L. Ed.2d 598 (1989),

however, the United States Supreme Court held that §1981 's implicit cause of action

does not extend to suits brought against state actors.  Id. at 732. See Arendale v. City of

Memphis, --- F.3d ----, 2008 WL 731226 (6th Cir. 2008).  Accordingly, the City of

Mansfield is entitled to summary judgment as a matter of law as to the entirety of

Plaintiffs' claims brought pursuant to 42 U.S.C. §1981.

Further, as a matter of law, §1981 only provides relief for employment discrimination where the employment decision is motivated on the basis of race rather than upon the basis of sex.  In this instance, the Plaintiffs' complaints are race and sex discrimination.  However, it is long settled that claims of sex discrimination are not cognizable under §1981.  <u>Clark v. Morgan's Austintown Foods, Inc</u>., 405 F. Supp. 1008, 12 FEP Cases 708 (N.D. Ohio 1976).  Accordingly, all Defendants are entitled to summary judgment as a matter of law with regard to the Plaintiffs' sex discrimination claims brought pursuant to 42 U.S.C. §1981.

### 2. Sex and Race Discrimination under Title VII and O.R.C. 4112, and Race Discrimination under Section 1981.

The Plaintiffs first charge the City Defendants with discrimination based on sex (male) and race (white) pursuant to Title VII,  42 U.S.C. § 1981, and O.R.C. 4112. Courts have recognized the elements of the <u>prima facie</u> case and the allocations of the burden of proof remain the same for each of these statutory pleadings – Title VII, Section 1981, and O.R.C. 4112.  <u>Johnson v. University of Cincinnati</u>, 215 F. 3d 561, 573 (6th Cir. 2000);  <u>Williams v. Ford Motor Co.</u>, 187 F.3d 533, 538 (6th Cir. 1999);  <u>Bucher v. Sibcy Cline, Inc.</u>, 137 Ohio App.3d 230, 738 N.E.2d 435, 442 (2000) (noting that Ohio courts examine state employment discrimination claims in accordance with federal case law).

As the elements and burdens required in each of these statutes mirror each other, the Court will discuss the discrimination claims brought pursuant to these three statutes under the general rubric of Title VII.  <u>Newman v. Fed. Express Corp</u>., 266 F.3d

-20-

401, 406 (6th Cir. 2001) (A claim under 42 U.S.C. § 1981 fails where plaintiff is unable to establish a prima facie case under Title VII).  Title VII provides that "it shall be an unlawful employment practice for an employer" to discriminate on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a).  A person aggrieved by such discrimination may bring a civil action against the "employer." 42 U.S.C. § 2000e-5(b).

In the absence of direct evidence[6], to establish a prima facie case of discrimination, plaintiffs must use the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973).  To succeed in their sex or race discrimination claims, the Plaintiffs must prove their prima facie case, by a preponderance of the evidence, establishing: (1) they were members of a protected class; (2) they were qualified for their positions; (3) they suffered an adverse employment action; and, (4) circumstances indicated that their race or sex played a role in the adverse employment action.[7]  See McDonnell Douglas Corp. v. Green, 411 U.S. at 802; Braithwaite v. Timken Co., 258 F.3d 488, 493 (6th Cir. 2001).

---

[6]The Plaintiffs allege, but do not provide credible, material evidence of direct discrimination "which, if believed, requires a conclusion that unlawful discrimination was at least a motivating factor in the [Defendants'] actions" and "does not require a factfinder to draw any inferences" to reach that conclusion. Kicak v. Community Health Partners of Ohio, Inc., 400 F.3d 466, 470 (6th Cir. 2005).  Because the Court finds no material evidence of direct discrimination the Plaintiffs must establish a prima facie case of discrimination pursuant to the McDonnell Douglas formulation from which a discriminatory motive may be inferred.

[7]Put differently, element (4) requires the Plaintiffs to show, for the same or similar conduct, they were treated differently than similarly situated employees.

In Title VII "reverse discrimination" cases where, as here, a member of the majority is claiming discrimination on the basis of race and sex, the Sixth Circuit has held that to satisfy the first element of the McDonnell Douglas test, the plaintiff must demonstrate "background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority."  Grizzell v. City of Columbus, Div. of Police, 461 F.3d 711, 719 (6th Cir. 2006); Zambetti v. Cuyahoga Cmty. College, 314 F.3d 249, 255 (6th Cir. 2002) (quoting Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 67 (6th Cir. 1985)).  Under the fourth element of the McDonnell Douglas test, Plaintiffs must show that they were treated differently from other similarly-situated employees who were not members of the protected class of, in this instance, white males.  Zambetti, supra.

Therefore, the appropriate modified version of the McDonnell Douglas framework for a reverse discrimination case is that a plaintiff must show: "(1) background circumstances supporting the suspicion that the defendant is the unusual employer who discriminates against the majority; and (2) that the employer treated employees who were similarly situated, but not members of the protected group, more favorably."  Bushman, 107 Ohio App.3d at 662; see also Murray, 770 F.2d at 67 (modifying the McDonnell Douglas framework to accommodate reverse discrimination).

In this burden shifting test, if the Plaintiffs make such a prima facie showing of discrimination, the Defendants then have the burden "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  See McDonnell Douglas at 802, 93 S. Ct. 1817; Braithwaite, 258 F.3d at 493.

Finally, if the Defendants successfully articulate a legitimate, nondiscriminatory reason for the adverse employment action, the Plaintiffs have the burden to show that the Defendants' reason for the adverse employment action is pretext for what is, in essence, unlawful discrimination.  See McDonnell Douglas, 411 U.S. at 804, 93 S. Ct. 1817;  Braithwaite, 258 F.3d at 493.  The Plaintiffs "can demonstrate pretext by showing that the [Defendants'] proffered reason:  (1) has no basis in fact, (2) did not actually motivate the [Defendants'] challenged conduct, or (3) was insufficient to warrant the challenged conduct."  Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000).  The Sixth Circuit has adopted an approach that for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made."  Smith v. Chrysler Corp., 155 F.3d 799, 806-07 (6th Cir. 1998).  Pursuant to Smith, the "key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action."  Id. at 807.


3.      Plaintiffs' **Prima Facie** Case

**No Adverse Employment Action – Plaintiffs Hout, Jessee, Neumann, and Workman.**

Upon review of the record, the claims of race and sex discrimination by Plaintiffs Hout, Jessee, Neumann, and Workman fail as a matter of law because they admittedly suffered no adverse employment action.  (Hout Depo. 18; Jessee Depo. 33-34; Neumann Depo. 30-33; Workman Depo. 42-44).  The record indicates that Plaintiffs

-23-

Hout, Jessee, Neumann, and Workman received a total of five informal conferences and two written reprimands for minor job infractions between 1995 and the present.  Ms. Curry initiated none of this disciplinary action and, further, none of the action resulted in the loss of any pay, benefits, duties, responsibilities, position or employment status. See Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir.1999) (defining "adverse employment action" for purposes of a Title VII discrimination claim as a "materially adverse change in the terms and conditions of [plaintiff's] employment").

Accordingly, the Title VII claims of race and sex discrimination brought by Plaintiffs Hout, Jessee, Neumann, and Workman against the City of Mansfield fail as a matter of law.  Further, the Section 1981 race claim brought by Plaintiffs Hout, Jessee, Neumann, and Workman against the City Defendants and Ms. Curry fails as a matter of law.  Finally, the Section 4112 claim of race and sex discrimination brought by Plaintiffs Hout, Jessee, Neumann, and Workman against the City Defendants and Ms. Curry fails as a matter of law.  (See Second Amended Complaint, ¶¶38-39, 41, 47 & 65).   See Mitchell v. Vanderbilt University, 389 F.3d 177, 182-83 (6th Cir. 2004); Policastro v. Northwest Airlines, Inc., 297 F. 3d 535, 539, n. 1 (6th Cir. 2002).


**Background Circumstances requirement of the prima facie case – Plaintiffs Gibson, Benick, and Merritt.**

The Sixth Circuit has not developed a bright line test for what constitutes "background circumstances" for the purpose of the first McDonnell Douglas element in a reverse discrimination case.  Therefore, the Court looks to prior decisions for guidance.

In Zambetti v. Cuyahoga Community College, 314 F.3d 249 (6th Cir.2002), the court found inadequate plaintiff's evidence that the community college police chief disregarded the Selection Advisory Committee's recommendation only the three times the plaintiff was not promoted because no evidence was presented as to how many times the committee recommended the hiring of someone with less seniority.  314 F.3d at 257.  The court also determined that no inference could be drawn from the fact that the chief hired only one white person for ten to fifteen vacancies in six years because no evidence was presented concerning the racial composition of the applicant pools for those positions.  Id.  Nonetheless, the court found sufficient evidence to create an issue of fact as to the "background circumstances" element because the chief was himself African-American.  "This is sufficient, in our opinion, to satisfy Murray's 'background circumstances' requirement."  Id.

The composition of the workforce and the sex of the plaintiff's supervisor were similarly held to constitute sufficient "background circumstances" to satisfy the first element of the McDonnell Douglas test in Turner v. Grande Pointe Healthcare Community, 2007 WL 2601386 (N.D. Ohio Sept. 10, 2007), a reverse gender discrimination case.  In Turner, the court found the fact that the majority of the workforce and management at Grande Pointe, as well as all of the decision makers in the plaintiff's case, were females "support[s] the suspicion that the defendant is the unusual employer who discriminates against the majority."  Id. at *13.

In this instance, the composition of the workforce at the WWTP, was overwhelmingly white and male, as well as the fact that the decision-makers were also white and male, do not constitute sufficient "background circumstances" to satisfy the

necessary first element of the <u>prima facie</u> case, modified to accommodate the reverse discrimination characteristics of this case.  Also, militating against such a finding is the fact, brought forth in the evidence, that Ms. Curry is the only African American employee at the WWTP and for the bulk of time under consideration in this action she was also the only female employee.

### Similarly Situated requirement of the <u>prima facie</u> case – Plaintiffs Gibson, Benick, and Merritt.

The second element of the modified <u>prima facie</u> case requires the Plaintiffs show "that the employer treated employees who were similarly situated, but not members of the protected group, more favorably."  <u>Murray v. Thistledown Racing Club, Inc.</u>, 770 F.2d 63, 67 (6th Cir 1985).  Crucial to this element is the establishment of a "similarly situated" comparator who is not a member of the protected group.  In <u>Mitchell</u>, the Sixth Circuit held that the employee with whom the plaintiff wishes to compare his treatment with must be "similarly-situated in all respects."   <u>Mitchell</u>, 964 F.2d at 583 (quoting <u>Stotts v. Memphis Fire Department</u>, 858 F.2d 289 (6th Cir.1988)).

The Sixth Circuit has since clarified this to mean that the employee with whom the plaintiff wishes to compare his treatment with must be "nearly identical" in "all of the relevant aspects of his employment situation."  <u>Pierce v. Commonwealth Life Ins. Co.</u>, 40 F.3d 796, 802 (6th Cir. 1994).  In determining what the relevant aspects are, courts are to "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee."  <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344, 352 (6th Cir. 1998).

-26-

The Court finds no evidence that Plaintiffs Gibson, Benick and Merritt were treated differently from similarly situated employees who were not part of the protected group – white and male -- with regard to the relevant aspects of any adverse employment decision.  The Court recognizes the Plaintiffs' deposition evidence as either inadmissible or not material.  (Benick Depo. 197-200; Gibson Depo. 139-142).

While not "nearly identical," Ms. Curry, the only African-American employee at the WWTP, was subject to the same progressive disciplinary policies as each of the white, male Plaintiffs including Gibson, Benick, and Merritt.  Ms. Curry was placed on administrative leave for several months while the City and Mansfield Police Department investigated the Plaintiffs' allegations that Ms. Curry came to work with a firearm. (Klousiadis Dec. 4, 5).  The City and the Mansfield Police Department found a lack of evidence to support the Plaintiffs' allegations.  Id.  Ms. Curry was further disciplined by being suspended without pay on 6 May 2004 for improper conduct when she came to the WWTP at other than her regular work hours to seek an explanation from Plaintiffs Gibson and Benick for their prior statements to the Mansfield Police Department that she was carrying a firearm.  Ms. Curry was again suspended in July 2004 for not moving her office to a remote location as part of a policy designed to ease tensions between herself and the Plaintiffs.  Id. 14.

Finally, Ms. Curry was the only female employee for the majority of the relevant time under consideration.  The Plaintiffs have provided no admissible evidence that any other similarly situated female was treated differently with regard to disciplinary policies at the WWTP.  Plaintiffs Benick, Gibson and Merritt have failed to present credible evidence that they were treated less favorably than any similarly-situated non-white or

-27-

female employee.  "The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated."  Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998) (considering claim under the Age Discrimination in Employment Act).[8]

Taking all of their allegations as true, the Court concludes that Plaintiffs Benick, Gibson and Merritt have failed to make out a prima facie case of sex or race discrimination because they have not shown that they were treated differently from any other similarly situated employee as they have provided no comparable employee in their sex and race discrimination claims.

_____

[8]As the United States Supreme Court held in the context of a claim of race-based peremptory strikes of jurors, "a rule that no comparison [among prospective jurors] is probative unless the situation of the individuals compared is identical in all respects" would make claims of discrimination "inoperable," because "potential jurors are not products of a set of cookie cutters."  Miller-El v. Dretke, 545 U.S. 231, 247 n. 6, 125 S.Ct. 2317, 2329 n. 6, 162 L.Ed.2d 196 (2005).  This reasoning applies with equal force to the employment-discrimination context.  Therefore, to establish that an employee is an appropriate comparator, "the plaintiff [must] demonstrate that he or she is similarly situated to the [claimed comparator] in all relevant respects."  Ercegovich, 154 F.3d at 353.

In the disciplinary context, the Sixth Circuit has held that to be found similarly situated, the plaintiff and his or her proposed comparator must have engaged in acts of "comparable seriousness."  Clayton v. Meijer, Inc., 281 F.3d 605, 611 (6th Cir. 2002) (applying the Ercegovich approach to a Title VII claim) (quoting McDonald v. Santa Fe Transp. Co., 427 U.S. 273, 283 n. 11, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976)).  To make this assessment, courts look to certain factors, such as whether the individuals "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Ercegovich, 154 F.3d at 352 (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)).  However, when such factors are not relevant, the Court need not consider them.  Id.  To determine whether two individuals are similarly situated with regard to discipline, the Court will "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the [proposed comparable] employee."  Id.

**4.      Lack of Pretext in Plaintiffs' Race and Sex Discrimination Claims**

Even if the Plaintiffs had met their prima facie burden, the City has articulated legitimate, non-discriminatory reasons for the disciplinary action toward Plaintiffs Benick, Gibson and Merritt.[9]  McDonnell Douglas v. Green, 411 U.S. at 802-03; see also Lautermilch v. Findlay City Sch., 314 F.3d 271, 275-76 (6th Cir.), cert. denied, 540 U.S. 813 (2003);  Diehl v. Tele-Solutions, Inc., 57 F.3d 482, 483 (6th Cir. 1995).  Specifically, the City points to its progressive discipline policy and the implementation of that policy, for legitimate non-discriminatory reasons, with regard to Plaintiffs Gibson, Benick, and Merritt.

The disciplinary action taken against Mr. Gibson from June 1998 through June 2004 consisted of six informal conferences initiated by Ms. Curry for minor workplace infractions.  Mr. Benick received two informal conferences in September and October 2003 from Ms. Curry for minor workplace infractions.  These informal conferences are the lowest level of disciplinary action and do not weigh toward adverse employment action.

With the implementation of the new Pretreatment Procedures in July 2004, any disciplinary action taken toward Mr. Gibson or Mr. Benick ushered from the joint decision

---

[9]The Court notes that all of the Plaintiffs claim to have been improperly disciplined by Ms. Curry notwithstanding the evidence that Plaintiffs Hout, Jessee, Neumann, and Workman admit to having never been disciplined by Ms. Curry.  Further, of the remaining Plaintiffs – Benick, Gibson, and Merritt – Mr. Merritt was last disciplined by Ms. Curry in July 2002, placing that action outside of the Court's jurisdictional window.

of Ms. Curry and her supervisor Mr. Kulda.  Mr. Gibson received progressive discipline for workplace performance issues on two occasions: a written reprimand for leaving a sampling strainer in a sewer line in March 2005 and a one-day suspension for failing to begin work as ordered in June 2005.  Between March and November 2005 Mr. Benick faced progressive disciplinary action that resulted in his suspension for an accumulated total of thirty-four days as a result of workplace performance issues and for violating City policy by using City equipment for his personal use.  (Benick depo 440-46, 502-04).  The evidence indicates both Plaintiffs received predisciplinary hearings which established the charges and supported the discipline.

Between 1998 and 2005, Mr. Merritt received discipline on twelve occasions.  Mr. Merritt received an informal conference from Ms. Curry in 2002 for failing to report to work on time.  From his supervisor, Mr. Coker, he received five informal conferences, one written reprimand for absenteeism and a fifteen-day suspension (later stayed by agreement) for failing to turn off electric blowers.  From Mr. Coker's supervisor, Otto Kulda, Mr. Merritt received an informal conference, and was initially terminated and instead received a one-day suspension, by agreement between Merritt, the City and the Union, for denying at a predisciplinary hearing that he was reading a personal book while on duty.  Mr. Merritt was again disciplined with termination in November 2005 for failing to carry out a workplace assignment and for denying any responsibility.  The City's action went to arbitration where the arbitrator reinstated Mr. Merritt without backpay but found the Plaintiff Mr. Merritt had failed to carry out the task, had tried to cover-up his failure, had lied during the predisciplinary hearing, and engaged in conduct which justified the imposition of discipline.

The Court finds the City has provided legitimate non-discriminatory reasons for these actions.  See Duggan v. Orthopaedic Inst. of Ohio, Inc., 365 F.Supp. 2d 853, 861 (N.D. Ohio 2005) ("The determination of whether an employer reasonably relied on the facts before it does not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action").  The Court finds the evidence indicates the City had legitimate non-discriminatory reasons for implementing the progressive disciplinary measures and was not engaged in discriminatory animus toward Plaintiffs Gibson, Benick or Merritt.

The burden then shifted to the Plaintiffs to show that the City's articulated reasons for disciplinary action against Plaintiffs Benick, Gibson, and Merritt were a pretext for discrimination.  See Allen v. Michigan Dep't of Corrections, 165 F.3d 405, 409 (6th Cir. 1999); see also Johnson v. O'Neill, No. 04-3550, 2005 WL 1027554, at *6 (6th Cir. May 3, 2005).  The Plaintiffs Gibson, Benick, and Merritt have not presented evidence from which the Court could reasonably conclude there existed a genuine issue of material fact that the City Defendants' articulated bases for carrying out disciplinary action could be considered a pretext for unlawful race or sex discrimination.  See McDonell Douglas, 411 U.S. at 802-03; Allen, 165 F.3d at 409.  Accordingly, the City Defendants are entitled to summary judgment in their favor on the Plaintiffs' instant claims of race and sex discrimination pursuant to Title VII.

**C.**     **Plaintiffs' State Claim of discrimination under O.R.C. 4112 brought against Curry, Fisher and Klousiadis as Individuals**

The Ohio Supreme Court has held that the coverage of O.R.C. § 4112.02(A) is identical to the coverage of federal law prohibiting discrimination in the employment context.  Thus, evidence sufficient to support a finding of discrimination under Title VII of the Civil Rights Act of 1964 or the Americans with Disabilities Act is necessary before a violation of § 4112.02(A) can be shown.  Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n, 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981).

While the Sixth Circuit has held that individual employees cannot be held liable under Title VII, Wathen v. General Electric Co., 115 F.3d at 405, under Ohio law, a supervisor and employer may be jointly and severally liable for discriminatory conduct. Genaro v. Central Transport, Inc., 703 N.E.2d 782 (Ohio 1999).  Nevertheless, because the Plaintiffs have failed to show discrimination on the part of the City, the claims under Ohio law against Curry, Fisher, and Klousiadis as individual supervisors must also be dismissed.  See Booker v. Dee Sign Co., Slip Copy, 2008 WL 839786 (S.D. Ohio, 2008);  accord Novotny v. Reed Elsevier, 2007 WL 2688171, *24 (S.D. Ohio 2007) (unpublished).

Accordingly, the Court will grant summary judgment to the City on the Plaintiffs' federal race and sex discrimination claims, and also grant summary judgment to the individual Defendants on the Plaintiffs' state discrimination claims.

### D.    Race and Sex Discrimination Claims Against the Union Defendants Under Title VII, §1981 & O.R.C. 4112

The Plaintiffs bring race and sex discrimination claims pursuant to Title VII, and its state and federal analogs, against the Union Defendants in their representative

capacity.  Second Amended Complaint, ¶¶44, 90-99, 117.  Title VII provides the

following with regard to labor organizations:

> (c) Labor organization practices
>
> It shall be an unlawful employment practice for a labor organization--
>
> > (1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;
> >
> > (2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or
> >
> > (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

42 U.S.C.A. § 2000e-2(c).

Except in very few instances, see Rainey v. Town of Warren, 80 F. Supp. 2d 5,

14-16 (2000), in a case such as this, where plaintiff union members bring claims of race

and sex discrimination against their representative labor organization, courts have

crafted an analysis similar to the McDonnell Douglas framework used in the employer-

employee context.  See Driver v. U.S. Postal Services, Inc. 328 F. 3d 863, 868-69 (6th

Cir. 2003); York v. A.T. & T. Co., 95 F.3d 948 (10th Cir. 1996);  Robinson v. Central

Brass Mftrg. Co., 987 F. 2d 1235, 1238-39 (6th Cir. 1993); Patterson v. United

Steelworkers of America, 2005 WL 1539264 (N. D. Ohio 2005).

Pursuant to that analysis, as enunciated in Bugg v. Int'l Union of Allied Industrial

Workers of America, Local 507 AFL-CIO, 674 F. 2d 696 (7th Cir.) cert. denied 459 U.S.

-33-

805 (1982), to establish a <u>prima facie</u> case of discrimination against the Union

Defendants for an alleged failure to assist or file grievances, the Plaintiffs must show: (1)

that the City of Mansfield committed a violation of the collective bargaining agreement

("CBA") with respect to the Plaintiffs; (2) the Union Defendants breached its own duty of

fair representation; and (3) the Union Defendants' actions were motivated by racial

animus.  <u>Bugg</u>, 674 F. 2d at 599-600 & fn. 5.

    This Court finds the analytical framework enunciated in <u>Bugg</u> applicable to the

disparate treatment claims forwarded in this case.  Contrary to the Plaintiffs' position

(Doc. 163) the <u>Bugg</u> analysis is not restricted to cases of direct discrimination, and each

of the three required elements in <u>Bugg</u> remain viable in a case of this instance.

Accordingly, the Plaintiffs' reliance upon the reasoning in <u>Agosto v. Correctional Officers</u>

<u>Benevolent Assn.</u>, 107 F. Supp. 2d 294 (S.D.N.Y. 2000), <u>Marquart v. Lodge 837,</u>

<u>IAMAAW</u>, 26 F. 3d 842 (8th Cir. 1994) and <u>Greenier v. PACE, L. 1188</u>, 201 F. Supp. 2d

172 (D. Me. 2002) are misplaced, as these opinions do not stand for the proposition that

discriminatory animus need not be shown in this discriminatory treatment case.

    In applying the <u>Bugg</u> framework to the Plaintiffs' race and sex discrimination

treatment claims under Title VII, the Court not only finds no material evidence in support

of the Plaintiffs' allegations,[10] but also finds the Court itself lacks subject matter

_____

        [10]As to the first element of the <u>Bugg</u> test, the Plaintiffs have failed to plead,
let alone prove that the City of Mansfield engaged in any breach of the CBA.
<u>DelCostello v. International Broth. Of Teamsters</u>, 462 U.S. 151 (1983) Further, as
to the third element of the <u>Bugg</u> test, the Plaintiffs have not provided a genuine
issue of material fact to establish that the Union Defendants harbored racial
animus toward these white male employees.  (Jessee Depo. 240-47; Merritt
Depo. 301; Workman Depo. 244-46; Benick Depo. 334-35; Hout Depo. 224;
Neumann Depo. 178-79; Gibson Depo. 383-84).

jurisdiction to even consider the claim as it is predicated on a violation of the Union Defendants' duty of fair representation.  <u>See</u> <u>Hayner v. City of Washington Courthouse, et al.</u> Case No. 07-3277, (unpublished) (6th Cir. Dec. 14, 2007).

Federal Courts have jurisdiction to determine violations of the statutory duty of fair representation pursuant to the National Labor Relations Act ("NLRA"), but only if the labor organization alleged to have breached the duty of fair representation is subject to the NLRA.  <u>Vaca v. Sipes</u>, 386 U.S. 171 (1967).  However, pursuant to O.R.C. Chap. 307, the City of Mansfield is a political subdivision not covered under the NLRA's definition of "employer."  <u>See</u> <u>Lander v. Montgomery Co. BCC</u>, 159 F. Supp. 2d 1044 (S.D. Ohio 2001).  Rather than representing the Plaintiffs under the NLRA, the Union Defendants have been granted the exclusive right to represent employees of the City pursuant to O.R.C. Chap. 4117, the Ohio Public Employee Collective Bargaining Act.  Under O.R.C. 4117 the duty of fair representation is specifically recognized as an unfair labor practice.  See O.R.C. 4117.11(B)(6).[11]  Both the second element of the <u>Bugg</u> test and the Plaintiffs' claim for breach of a duty of fair representation are governed by Chapter 4117, which provides for exclusive jurisdiction by the State Employees Review Board ("SERB").  <u>See</u> <u>Franklin Co. Law Enforcement Assn. V. F.O.P., Capital city Lodge No. 9</u>, 59 Ohio St. 3d 167; <u>see also</u> <u>Featherstone v. Columbus Public Schools</u>, 39 F. Supp. 2d 1020 (S.D. Ohio, 1999) (finding public school teacher's claim that teachers'

---

[11](B) It is an unfair labor practice for an employee organization, its agents, or representatives, or public employees to . . . (6) Fail to fairly represent all public employees in a bargaining unit.  O.R.C. 4117.11(B)(6)

union breached its duty of fair representation amounted to unfair labor practice claim

governed by Ohio statute regulating labor relations between public employees and their

employer and, thus, teacher was required by statute to first bring claim with State

Employment Relations Board (SERB), not federal district court).  Accordingly, Plaintiffs'

arguments to the contrary (Doc. 163), this Court has no jurisdiction to entertain a claim

of breach of duty of fair representation where, as here, the plaintiffs have failed to

exhaust their administrative remedies with the SERB.  (Miller Dec. ¶42).[12]

In the alternative, the Plaintiffs allege the Union Defendants are liable for

discriminatory conduct by acquiescing in the City Defendants' and Ms. Curry's

discrimination.  Plaintiffs maintain that the Union Defendants' passive acquiescence in

discrimination by their employer is, in and of itself, sufficient to result in Title VII liability,

irrespective of the Union Defendants' motives.  Courts recognize that proof of inaction

on the part of the union, without more, is not sufficient to establish that the union

acquiesced in discriminatory conduct.  "Acquiescence requires (1) knowledge that

prohibited discrimination may have occurred and (2) a decision not to assert the

discrimination claim."  York v. American Tel. & Tel. Co., 95 F.3d 948, 956-57 (10th Cir.

1996).  A union may be held liable if it purposefully acts or refuses to act in a manner

which causes the employer to discriminate.  Hardison v. Trans World Airlines, Inc., 527

F.2d 33, 42 (8th Cir.1975), rev'd on other grounds, 432 U.S. 63 (1977).

---

[12]Had the Plaintiffs sought and obtained a finding from SERB that the
Union Defendants had violated their duty of fair representation the Plaintiffs could
have used that determination as a basis of a derivative Title VII claim under
Bugg.  The Plaintiffs did file an unfair labor practices charge against both the
Ohio Council and the Local Union on 28 January 2005 but voluntarily dismissed
each of their charges on 6 June 2005.  (Miller Dec 39, 40)

However, while the United States Supreme Court has left open the possibility that this is a viable theory of recovery against a union in a Title VII disparate impact case, acquiescence alone is insufficient where, as here, plaintiff's claim is one of disparate treatment.  See Goodman v. Lukens Steel Co., 482 U.S. 656, 665-66 & n. 10 (1987); York, supra.  Further, even if an acquiescence claim could be applied in this disparate treatment case, the Plaintiffs are still required to establish discriminatory intent on the part of the Union Defendants.  Yet, the Plaintiffs' deposition testimony and the material evidence submitted to the Court establishes that the Union Defendants filed numerous grievances and further represented the Plaintiffs in disputes over Ms. Curry's alleged threatening or harassing behavior as well as the City's disciplinary actions that did not involve Ms. Curry.  The evidence also establishes the absence of contemporary grievance claims forwarded by the Plaintiffs to the Union Defendants of discrimination based on their status as white males.  The two stray comments by Ms. Curry, in which she allegedly called the Plaintiffs "lying white devils" and remarked on the benefit of "black female" workers, did not at the time the statements were uttered, according to the admissible evidence provided, rise to such a level of discriminatory offense as to compel the Plaintiffs to tell the Union Defendants about the statements.  (Workman Depo. 222-27; Neumann Depo. 181-215; Hout Depo. 320).[13]

Finally, Plaintiffs testimony did not identify any admissible evidence of preferential treatment by the Union Defendants of similarly situated non-white or female employees

---

[13]Plaintiffs' later declarations which provide a supportable gloss on the facts in their previous deposition testimony are merely general allegations that the Court will not consider in determining the summary judgment motions.  See Williams v. Baltimore & Ohio Railroad Co., 303 F. 2d 323, 234 (6th Cir. 1962).

-37-

in the filing or processing of discrimination, harassment, threat, or hostile work environment claims.  (Neumann Depo. 152-54; Workman Depo. 279-81; Gibson Depo. 395-97; Benick Depo. 395; Merritt Depo. 378-83; Hout Depo. 274-76).

The Court will find the Union Defendants entitled to summary judgment on the Plaintiffs' race and sex discrimination claims pursuant to Title VII, 42 U.S.C. §1981, and O.R.C. 4112.


### E.    Plaintiffs' Retaliation Claim

"In an action under Title VII, the plaintiff may prove unlawful retaliation by presenting direct evidence of such retaliation or by establishing a prima facie case under the McDonnell Douglas framework."  Abbott v. Crown Motor Co., 348 F. 3d 537, 542 (6th Cir. 2003) (referring to McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).  Absent direct evidence of retaliation, as is the case here, retaliation claims are subject to the same McDonnell Douglas burden-shifting framework as discrimination claims.  Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 563-64 (6th Cir. 2004).

To establish a prima facie case of retaliation under Title VII, the Plaintiffs must show that "(1) [they] engaged in activity protected by Title VII [or § 4112]; (2) this exercise of protected rights was known to [the Defendants]; (3) [the Defendants] thereafter took adverse employment action against [the Plaintiffs]; and (4) there was a causal connection between the protected activity and the adverse employment action." Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 736 (6th Cir. 2006); Ford v. General Motors Corp., 305 F.3d 545, 552-53 (6th Cir. 2002).

-38-

## 1.     Adverse Employment Action

The third requirement for a prima facie case of retaliation involves the question of whether the employer subjected the employee to severe retaliatory action.  The retaliatory action need not specifically affect the plaintiff's employment.  In Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 2414-16, 165 L.Ed.2d 345 (2006), the United States Supreme Court recognized that the standard for establishing an adverse employment action in a retaliation claim is not as high as the standard for establishing the adverse action in a discrimination claim under Title VII. The U.S. Supreme Court held that, to prove retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " Id. at 2415 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  In Burlington, the U.S. Supreme Court stated that "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his [or her] employment or by causing him [or her] harm outside the workplace." Id. at 2412.   The U.S. Supreme Court went on to state that "reassignment of job duties is not automatically actionable" and that a trier of fact must look at the circumstances of a particular case and judge the case from the viewpoint of a reasonable person in the place of the plaintiff.  Id. at 2417 (citing Oncale v. Sundowner Offshore Servs., Inc., 532 U.S. 75, 81 (1998)).

In Burlington, the plaintiff, who was a forklift operator, was transferred to a position that was widely known to be a much harder and much dirtier position after she complained that her supervisor had sexually harassed her.  Id. at 2406.  Later, after the

-39-

plaintiff complained about her transfer, she was suspended for thirty-seven days without pay for insubordination.  While the plaintiff was eventually given back pay for this suspension, the United States Supreme Court noted the plaintiff and her family were forced to live without an income for thirty-seven days.  Id.  Because of the obviously downgraded conditions of the plaintiff's job as well as the thirty-seven day suspension, the U.S. Supreme Court found that a reasonable juror could have found that the defendant's actions against the plaintiff were materially adverse.  Id. at 2417.

### 2.    Causation

To establish the fourth, or causal connection, element of a prima facie case of retaliation, Plaintiffs must adduce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken if the Plaintiffs had not engaged in protected activity.  Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000).  There is no one dispositive factor required to establish a causal connection; however, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation.  Id.;  Tuttle v. Metro Gov't of Nashville, 474 F.3d 307, 321 (6th Cir. 2007).  Where the time period between the protected activity and the adverse employment action is less than two months, this may be sufficient.  Asmo v. Keane, Inc., 471 F.3d 588, 593 (6th Cir. 2006).  However, "the mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim."  Balmer v. HCA, Inc., 423 F.3d 606, 615 (6th Cir. 2005).

The Sixth Circuit has indicated that there are certain cases where temporal proximity alone may give rise to an inference of retaliation. See, e.g., Nguyen, 229 F.3d at 567 ("while there may be circumstances where evidence of temporal proximity alone would be sufficient to support [an inference of a causal link], we do not hesitate to say that they have not been presented in this case"); Ford v. General Motors Corp., 305 F.3d 545, 554-55 (6th Cir. 2002) (quoting Moon v Transport Drivers, Inc., 836 F.2d 226, 229 (6th Cir. 1987)) ("Although 'temporal proximity alone will not support an inference in the face of compelling evidence' to the contrary, 'the proximity in time between protected activity and adverse employment action may give rise to an inference of a causal connection' "); DiCarlo v. Potter, 358 F.3d 408, 421 (6th Cir. 2004) ("this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise.").

The Circuit Court suggested in a recent decision, however, that temporal proximity is never sufficient, standing alone, to permit an inference of a causal connection.  See Randolph v. Ohio Dep't of Youth Services, 453 F.3d 724, 737 (6th Cir. 2006) ("Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection.")

Further, the Sixth Circuit has recognized that in order to show a causal connection, a plaintiff must show "a temporal connection coupled with other indicia of retaliatory conduct."  Little v. BP Exploration & Oil Co., 265 F.3d 357, 364 (6th Cir. 2001).

As stated in <u>Little</u> there must be other evidence of retaliatory conduct, along with the temporal connection, in order to satisfy the causal connection requirement of a <u>prima facie</u> case of retaliation.  <u>Little</u>, 265 F.3d at 364.  In <u>Little</u>, Little's co-workers testified that they were asked to make false claims of theft and harassment against Little or they would lose their jobs.  <u>Id</u>. at 365.  Little was also disciplined for being out of uniform when his co-workers, who were also technically in violation of the uniform requirement, were not punished.  <u>Id</u>.  In <u>Harrison</u>, the Sixth Circuit found that three of Harrison's co-workers feared retaliation because they had testified at Mr. Harrison's EEOC hearing and that one of Mr. Harrison's supervisors made repeated comments about wanting to run people out of his department.  <u>Harrison</u>, 80 F.3d at 1119.  This behavior, coupled with the temporal proximity of Harrison's complaint to the EEOC and his suspension from his job satisfied the causal connection.  <u>Id</u>.

### 3.    Plaintiffs' Retaliation Claims Against the City Defendants

As an initial matter, even under the broader standard allowed for considering adverse employment actions, pursuant to the decision in <u>Burlington Northern</u>, this Court finds no material evidence in the record to establish that Plaintiffs Hout, Jessee, Neumann or Workman suffered any adverse employment action.[14]  Plaintiffs' global claim, which would include Plaintiffs Jessee, Neumann, Workman and Hout, that the

---

[14]Plaintiffs Neumann, Jessee, and Workman did not ask to file any grievances after 25 August 2004 while Plaintiff Hout filed a grievance on 25 August 2004 over loss of pay when he had to attend a grievance hearing.  That grievance was appealed and mediated.  Mr. Hout voluntarily withdrew his grievance subsequent to the mediation.

City Defendants' action denying them overtime represented an adverse employment action fails to give rise to a genuine issue of material fact.  See Martin v. General Electric Co., 187 Fed. Appx. 553, *7-8 (6th Cir. 2006) (affirming grant of summary judgment on retaliation claim where plaintiff failed to establish entitlement to overtime or that similarly situated employees garnered more overtime); see also Broska v. Henderson, 70 Fed. Appx. 262, 268 (6th Cir. 2003).  The Plaintiffs have provided no evidence that similarly situated employees outside of the protected class garnered overtime when the Plaintiffs were denied that opportunity.  Further, the Court finds no basis for a claim of retaliation on the assertion of denied overtime where the evidence indicates the Plaintiffs voluntarily refused overtime.  (Workman Depo. 75; Hout Depo. 293; Jessee Depo. 47; Neumann Depo. 35).

The Plaintiffs further argue that the City's policies banning the use of cell phones during work hours, prohibiting WWTP employees from tape-recording one another, and preventing employees from engaging in personal conversations on paid time, all amount to retaliatory action.  (Jessee Depo. 142; Workman Depo. 241-43).  These workplace rules, implemented as policy toward all employees simply do not amount to retaliation as they neither amount to adverse action directed at the Plaintiffs per se, nor are they causally linked to the Plaintiffs' filing of their EEOC complaint or the instant legal action.  As a result, these Plaintiffs have not made a prima facie case of retaliation under Burlington Northern.

Of the remaining Plaintiffs under consideration – Plaintiffs Benick, Gibson, and Merritt – each show an adverse employment action in which the City took disciplinary measures against them after they filed their EEOC complaint and the instant suit.

-43-

However, the evidence indicates these disciplinary actions were so removed in time from the EEOC filing that they do not establish causation, and the actions were either related to job performance or to the violation of City policy.

During this period, Mr. Gibson received a written reprimand for leaving a sampling strainer in a sewer line, a one day suspension for failing to begin work in the field as ordered and he was reprimanded but not disciplined on two other occasions for failure to properly prepare paperwork or to properly clean equipment.  (Blamer at ¶¶ 10-12, 21; Klousiadis ¶ 19).  The most proximate action, the written reprimand for leaving a sampling strainer in a sewer line on 17 March 2005, occurred soon after the February 2005 filing of the Plaintiffs' EEOC complaint against the Union Defendants.  However, pursuant to the decisions in Randolph and Little, supra, without more, the Court does not consider the City Defendants' actions toward Mr. Gibson sufficient to establish causation for a claim of retaliation.

As indicated earlier, Mr. Benick was subject to a series of job-related progressive disciplinary measures following the WWTP's implementation of the new Pretreatment Procedures after July 2004.  Disciplinary measures taken by the City Defendants against Mr. Benick after the filing of the EEOC complaint included a written reprimand for failing to prepare paperwork properly on 21 March 2005, a one-day suspension for leaving a strainer in a sewer line on 17 March 2005, a three-day suspension for failing to report to work in the field as ordered on 14 June 2005, a fifteen-day suspension for failing to properly clean equipment from 12 through 20 October 2005, and a fifteen-day suspension for unauthorized use of City equipment.  As with Mr. Gibson, and pursuant to the 6th Circuits' decisions in Randolph and Little, supra, without more than mere

-44-

proximity the Court does not consider the City Defendants' actions toward Mr. Benick

sufficient to establish causation for a claim of retaliation.

In the period following the Plaintiffs' filing of their EEOC complaints Mr. Merritt

was charged, in September 2005, with providing the City with a false statement.  Mr.

Merritt was found reading a personal book while on duty and subsequently provided

false testimony regarding his actions at his predisciplinary hearing.  Mr. Merritt was

initially terminated but accepted a one-day suspension in lieu of termination following

negotiations between the Union Defendants and the City.  In November 2005, Mr.

Merritt was again terminated by the City for providing a false statement to the City.  In

terminating Mr. Merritt, the City charged Plaintiff Merritt with lying during his

predisciplinary hearing about failing to timely remove and refrigerate bacterial samples

from a water bath.  The City's action was taken to an arbitrator who found the Plaintiff,

Mr. Merritt had engaged in a cover-up of his conduct which "clearly justified"  the

imposition of discipline, but not termination.  The arbitrator ordered Mr. Merritt reinstated

but without back-pay.  As with Mr. Gibson, pursuant to the decisions in <u>Randolph</u> and

<u>Little</u>, <u>supra</u>, without more, the Court does not consider the City Defendants' actions

toward Mr. Merritt sufficient to establish causation for a claim of retaliation.

Further, in this instance, the temporal removal of Mr. Merritt's EEOC activity from

his discharge proceedings in late 2005, is too great to provide the necessary causality

determinations for a <u>prima facie</u> case of retaliation.  While the Plaintiffs' briefings are

replete with opinion evidence that his termination resulted from his prior EEOC activity,

such bald speculation is insufficient to overcome a motion for summary judgment.

"[T]his circuit has long held that '[m]ere conclusory and unsupported allegations, rooted

-45-

in speculation, do not meet [the] burden' " of demonstrating that there is a genuine issue

for trial.  Bell v. Ohio State University, 351 F.3d 240, 253 (6th Cir. 2003) (quoting Bryant

v. Commonwealth of Kentucky, 490 F.2d 1273, 1274 (6th Cir. 1974) (per curiam)).

As such, plaintiffs Benick, Gibson and Merritt have not established the necessary

causal connection for their prima facie retaliation claim which requires they produce

sufficient evidence from which the Court may infer that any discipline they received

would not have occurred but for their claims.  See Nguyen v. City of Cleveland, 229 F.3d

559 (6th Cir. 2000).


### 4.    Plaintiffs' Retaliation Claim Against Ms. Curry

While Ms. Curry is not liable for a claim of retaliation pursuant to Title VII, she

may be liable under Ohio Rev. Code § 4112.02, which makes it illegal

> (I) For any person to discriminate in any manner against any other person
> because that person has opposed any unlawful discriminatory practice
> defined in this section or because that person has made a charge,
> testified, assisted, or participated in any manner in any investigation,
> proceeding, or hearing under §§ 4112.01 to 4112.07 of the Revised Code.

Upon review of the evidence, testimony, and affidavits, the Court determines that

the Plaintiffs have not established a prima facie case of retaliation against Ms. Curry.

Plaintiffs Hout, Jessee, Neumann, and Workman have not shown the Court they

suffered an adverse employment action under the standard established in Burlington

Northern.  Plaintiffs' allegations of unfair plant-wide policies, implemented so as to effect

all employees, do not implicate Ms. Curry.  Further, with Mr. Klousiadis' propounding of

the Pretreatment Procedures in July 2004, any disciplinary actions against sampling

aides Benick and Gibson were implemented only on the joint findings of Ms. Curry and

-46-

Mr. Kulda.  The disciplinary action visited upon Mr. Merritt did not involve Ms. Curry who

had disciplined him on only one occasion during the previous ten years when he

received an informal conference from her on 3 January 2002.  (Merritt Depo. 81-97).  As

previously noted in the Court's discussion of the Plaintiffs' retaliation claim against the

City Defendants, the disciplinary evidence involving Mr. Benick and Mr. Gibson,

following the Plaintiffs' EEOC filing, fails to establish the causation element of the prima

facie retaliation claim.  Ms. Curry's involvement in those disciplinary measures, along

with Mr. Kulda, does not alter the legal landscape of that determination.


### 5.      Plaintiffs' Retaliation Claims against the Union Defendants

Plaintiffs allege that the Union Defendants engaged in retaliation when they

allegedly:  improperly disciplined them; harassed them; threatened them with negative

job actions; told them they could not speak to each other at work; refused to represent

them; and demeaned and defamed them because they complained about Ms. Curry's

behavior.  Plaintiffs further allege the Union Defendants retaliated against them in

several statements and by acquiescing in City discrimination.[15]  The Plaintiffs maintain,

as they must, that the Union Defendants engaged in these alleged retaliatory actions

after the Plaintiffs engaged in the protected action of filing their EEOC charge as well as

in the instant action, naming the Union Defendants.

Even considering the lower threshold for adverse employment action as rendered

by Burlington Northern to mean that the Union Defendants' "actions must be harmful to

---

[15]The Court has addressed, and disposed of, the Plaintiffs' Union
acquiescence claim, supra.

the point that they could well dissuade a reasonable worker from making or supporting a charge of retaliation," the Court finds no evidence in the record that the Union Defendants engaged in harassing, demeaning or threatening behavior that might, thereby, dissuade any of the Plaintiffs from exercising protected activity.  Instead, the uncontroverted record establishes that the Union Defendants filed and processed a litany of grievances on the behalf of the Plaintiffs as a group, and as individual Union members, asserting claims of hostile work environment, harassment and threat against the City and Ms. Curry.

### 6.    Plaintiffs' have not Established Pretext in their Retaliation Claim

Assuming, arguendo, that the Plaintiffs had met their prima facie burden in this instant claim of retaliation, the Defendants may rebut the presumption of retaliation from the prima facie case by asserting a legitimate, non-discriminatory reason for their actions.  Balmer v. HCA, Inc. 423 F.3d, 606, 614 (6th Cir. 2005).

Even if the Court found any one, or all, of the Plaintiffs had established a prima facie case of retaliation, the Court's analysis would require a consideration of pretext. As with a claim of discrimination, upon establishing a prima facie case the burden then shifts to the defendant to "articulate a legitimate, non-discriminatory reason for the adverse action."  Abbott v. Crown Motor Co., Inc., 348 F.3d 537, 542 (6th Cir. 2003). The Defendants have met this burden by establishing that any disciplinary action was related to job performance or violation of City policies (City Defendants, Ms. Curry) or by

-48-

providing proof that Plaintiffs received representation in their grieving against any disciplinary action or alleged harassing or hostile behavior (Union Defendants).

Once the Defendants establish a legitimate, non-discriminatory reason for taking disciplinary action, the burden shifts back to the Plaintiffs, requiring them to demonstrate by a preponderance of the evidence that the proffered reasons were a mere pretext for a retaliatory animus. Ibid. "An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." Smith v. Chrysler Corp., 155 F.3d 799, 805-06 (6th Cir. 1998). "In challenging an employer's action, an employee 'must demonstrate that the employer's reasons (each of them, if the reasons independently caused [the] employer to take the action it did) are not true.' " Id. (quoting Kariotis v. Navistar Int'l Trans. Corp., 131 F. 3d 672, 676 (7th Cir.1997)).

In examining whether the stated reason is pretext, the Court must determine whether the employer (or Union entity) reasonably relied on the particularized facts before it at the time it made the employment decision. Smith, 155 F.3d at 807. The employer is not required to show that it left no stone unturned; rather, the issue is whether the employer made a reasonably informed and considered decision before taking the adverse employment action. Id. The Court should not blindly accept the proffered reason as honest. Id. If the employee adduces evidence establishing that the employer failed to make a reasonably informed and considered decision, then its decisional process is "unworthy of credence," and any reliance by the employer on such a process cannot be deemed "honestly held." Id . at 807-08. "[E]stablishing that the employer's reason was a pretext requires that a plaintiff do more than simply impugn the

legitimacy of the asserted justification; in addition, the plaintiff must also adduce evidence of the employer's [retaliatory] animus."  Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 804 (6th Cir. 1994).

The Court has already determined, in conjunction with the Plaintiffs' discrimination claim with regard to this series of incidents, that  there existed insufficient evidence to establish pretext.  The Plaintiffs present no additional evidence to indicate that either the City Defendants, Ms. Curry, or the Union Defendants were engaging in pretext in the context of their retaliation claims.  Accordingly, summary judgment is proper on these latter, retaliation claims, as well as the former discrimination claims involving action against the Plaintiffs as a group and individually.


**F.     Plaintiffs' Hostile Work Environment Claim**

Plaintiffs next argue that the alleged race and sex discrimination brought about by Ms. Curry created a hostile work environment.  The Plaintiffs bring this claim against all Defendants.

To establish a prima facie case the Plaintiffs must overcome four hurdles.  First, as white males, the Plaintiffs must prove "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority."  Sutherland, 344 F.3d at 614.  Additionally, the Plaintiffs must show they were subjected to unwanted race and sex harassment, that the harassment was based on race or sex, and that the harassment "had the effect of unreasonably interfering with [their] work performance by creating an intimidating, hostile, or offensive work environment. . . ."  Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999).

Courts recognize that under Title VII, a hostile work environment occurs only when an individual's workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed.2d 295 (1993).  In order to prevail on a Title VII hostile work environment claim, a plaintiff must prove that the defendant's conduct was objectively severe or pervasive enough to create a work environment that any reasonable person would find hostile or abusive, and the victim must subjectively regard the environment as abusive.  Id. at 21-22;  Adams v. Tennessee Dept. Of Finance and Admin., 179 Fed. Appx. 266, 274 (6th Cir. 2006) ; Bowman v. Shawnee State Univ., 220 F.3d 456, 463 (6th Cir. 2000).  Whether an environment is hostile or abusive can be determined only by looking at the totality of the circumstances.  Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed. 2d 662 (1998).

"The Supreme Court has consistently held that 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.' " Newman v. Fed. Express Corp., 266 F.3d 401, 405 (6th Cir. 2001) (quoting Faragher, 524 U.S. at 788, 118 S. Ct. 2275).  Isolated incidents, unless extremely serious, are not sufficient to support a hostile work environment claim.  Morris v. Oldham County Fiscal Court, 201 F.3d 784, 790 (6th Cir. 2000).

As the United States Supreme Court has observed, Title VII is not a "general civility code." Faragher v. City of Boca Raton, 524 U.S. at 788.  "Of paramount importance, the court must 'distinguish between harassment and discriminatory

-51-

harassment,' because it is the latter that is requisite to a Title VII hostile work environment cause of action."  Morris, 201 at 790.  (Citing Bowman v. Shawnee State Univ., 220 F.3d 456, 464 (6th Cir. 2000)).  In other words, Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at harassment that occurs because of the protected class of the plaintiff.  Bowman, 220 F.3d at 463-64.

### 1.    Hostile Work Environment Claim against the City Defendants

As the Court has already found, with regard to the Plaintiffs' Title VII discrimination claim, the composition of the WWTP work force, as well as the decision-making structure at the WWTP, does not avail itself of a showing that "background circumstances support the suspicion that the defendant [City] is that unusual employer who discriminates against the majority."  Sutherland, 344 F.3d at 614.  With regard to the first element of the prima facie case for a hostile work environment claim involving the majority, white male Plaintiffs, the Court finds the "background circumstances" do not support the suspicion that the City discriminates against white males at the Mansfield WWTP.

In addition, the Court does not find that the Plaintiffs have established, as they must as part of their prima facie case, evidence sufficient to prove that Ms. Curry's conduct was so severe and pervasive as to create a work environment which was both objectively and subjectively hostile.  Harris v. Forklift Sys., 510 U.S. at 21.  Pursuant to the decision in Harris, the Court looks at several factors in determining whether a work environment is objectively hostile, including the frequency and severity of the alleged conduct, whether the alleged behavior was physically threatening or humiliating or

-52-

merely offensive, and whether the conduct unreasonably interferes with the Plaintiffs'

work performance.  Harris 510 U.S. at 23.  Moreover, the alleged discriminatory conduct

cannot be considered in a vacuum; rather, an employee's claim must be evaluated in

light of the social context in which events occurred.  See Oncale v. Sundowner Offshore

Servs., Inc., 523 U.S. 75, 82, 118 S. Ct. 998 (1998).[16]

Upon review of the record evidence the Court concludes that none of the factors

that contribute to a finding of an objectively hostile work environment are present in this

_____

[16]As the United States Supreme Court has instructed in Oncale,
consideration of comments in the context of the workplace provides a necessary
perspective in gauging the relative behavior of the parties:

We have emphasized, moreover, that the objective severity of
harassment should be judged from the perspective of a reasonable
person in the plaintiff's position, considering "all the circumstances."
Harris, supra, at 23, 114 S.Ct., at 371. In same-sex (as in all)
harassment cases, that inquiry requires careful consideration of the
social context in which particular behavior occurs and is
experienced by its target. A professional football player's working
environment is not severely or pervasively abusive, for example, if
the coach smacks him on the buttocks as he heads onto the
field-even if the same behavior would reasonably be experienced
as abusive by the coach's secretary (male or female) back at the
office. The real social impact of workplace behavior often depends
on a constellation of surrounding circumstances, expectations, and
relationships which are not fully captured by a simple recitation of
the words used or the physical acts performed. Common sense,
and an appropriate sensitivity to social context, will enable courts
and juries to distinguish between simple teasing or roughhousing
among members of the same sex, and conduct which a reasonable
person in the plaintiff's position would find severely hostile or
abusive.

Oncale at 81-82.

case.  For instance, with regard to the severity of the comments, Plaintiff Benick testified

in deposition as to the alleged badgering and humiliation he suffered as follows:

> Q:    Okay. Tell me what [Ms. Curry] said that you regard as verbal
>       abuse and degradation?
>
> A:    It was pretty much the same thing over and over again.  You ain't
>       doing that right, This ain't done right, You can't do nothing right, Do
>       this over again, Do that, That ain't right, Do it again.  I've told her
>       we've done something when we're out in the field, Well, I didn't see
>       it, Do it again when she's standing right next to us.  Those sorts of
>       things.

(Troy Benick, Depo. 193-94).  When asked to testify as to how he was allegedly

humiliated by Ms. Curry, Plaintiff Gibson responded that Ms. Curry called him a liar to

other people and told other people "[w]e don't know what the hell we're doing."  (Gibson

Depo. 40).  Mr. Merritt testified that he was humiliated when Ms. Curry called him a thief

and a liar and remarked that women could clean better.  (Merritt Depo. 220).  Mr.

Workman recalled Ms. Curry yelling at him to "[g]et the hell out of the way," and

remarking, "Lewis, get the hell out of the room."  (Workman Depo. 266).  Mr. Neumann

admits that he has never personally been threatened or insulted by Ms. Curry.

　　　With regard to the frequency of these alleged outbursts by Ms. Curry, Plaintiff

Gibson could recall four occasions, in the course of his eleven year employment under

the supervision of Ms. Curry, in which Ms. Curry lost her temper and yelled at him or her

other supervisee Plaintiff Benick.  (Gibson Depo. 40-48, 116).  Plaintiff Jessee could

only remember one occasion in which he was berated by Ms. Curry and could not place

the date of the occurrence.  (Jessee Depo. 34-35, 46-47).  Mr. Hout testified that the

only racially charged comment Ms. Curry uttered, which was also not directed at him

personally, was a statement Ms. Curry made as she walked down a hallway at the

WWTP, presumably in reference to the Plaintiffs: "[t]hey're all just a bunch of lying white devils."  (Hout Depo. pp. 58).   Mr. Gibson and Mr. Benick both testified that on one occasion Ms. Curry called each of them a "lying white devil"; Mr. Benick could not recall when the comment was made.  (Benick Depo. 134-35; Gibson Depo. pp. 155).  Mr. Workman, who works the "graveyard" shift and ordinarily has no contact with Ms. Curry, testified that he had been called "lying White devil," White son of a bitch", "White mother fucker," "dumb White monkey," and "stupid redneck hillbilly."  Mr. Workman could not recall when Ms. Curry made these comments or in what context.  (Workman Depo. 266-67).  Plaintiffs Hout, Benick, Merritt and Workman testify to one incident in which Ms. Curry commented that if she had "black females" doing the job she would not have the problems she has had with the Plaintiffs.  (Hout Depo. 96; Benick Depo. 134-35; Merritt Depo. 221; Workman Depo. 277).

In his deposition testimony, Mr. Benick alleged that Ms. Curry threatened to shoot him and then drive to Bellville to shoot up his house.  Nevertheless, in earlier sworn testimony to the Mansfield Police, Mr. Benick denied that Ms. Curry or any of his co-workers had ever threatened him with physical harm.  (Benick Deposition Depo. 220-21, 248-50).  Mr. Merritt testified that Ms. Curry threatened to shoot him on two separate occasions, but Mr. Merritt did not consider the comments severe enough to contact the police.  (Merritt Depo. 166, 214).  Likewise, Mr. Workman testified that Ms. Curry allegedly threatened his life on two separate occasions but he was unable to testify as to which year those threats occurred.  Mr. Workman testified that he did not notify the police.  (Workman Depo. 176-87).

In this case, Ms. Curry's alleged comments were offensive and boorish, but not, taken objectively, sufficiently frequent, severe, physically threatening, or humiliating to unreasonably interfere with the Plaintiffs' work performance to constitute actionable work place harassment.  Accordingly, the Plaintiffs have not created a genuine issue of material fact that Ms. Curry's conduct constituted a hostile work environment and the City Defendants are entitled to summary judgment.

Further, the Court finds the City Defendants may avail themselves of the affirmative defense articulated in Faragher:

> When no tangible employment action is taken, a defending employer may raise as an affirmative defense to liability or damages, subject to proof by preponderance of the evidence . . . .  The defense comprises two necessary elements: (a) that the employer exercise reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

Faragher v. City of Boca Raton, 524 U.S. at 807.

The record before the Court establishes that Plaintiffs Hout, Jessee, Neumann and Workman received no discipline from Ms. Curry that would amount to a tangible employment action.  Plaintiff Merritt received one informal conference from Ms. Curry during the eight years prior to the Plaintiffs' legal action.  The disciplinary action initiated against Plaintiff Gibson was de minimus.  See Bowman v. Shawnee St. University, 220 F. 3d at 462-63.  The tangible employment actions brought against Plaintiffs Merritt and Benick resulted from on the job behavior or performance issues which were adjudicated by three white males: Plant Manager Klousiadis, HR Director Jeff Fogt and Public Works Director Fisher.  Evidence indicates that in the course of the Fall of 2003 and into early

-56-

2004 these same managers rejected certain proposed discipline against the Plaintiffs while also initiating disciplinary action against Ms. Curry.  (Klousiadis Dec., ¶ 3-7).  Plant managers initiated proceedings against Ms. Curry premised on the Plaintiffs' allegations, which were, in the course of an investigation, deemed unfounded.  Id.  See Swanson v. Livingston County, 121 Fed. Appx 80 (6th Cir. 2005) (upholding hostile work environment claim as a matter of law where employer conducted internal investigation of claims and returned reasonable disciplinary measures).

As to the necessary elements under Faragher, the evidence before the Court indicates the City of Mansfield exercised reasonable care to prevent and correct promptly any harassing behavior.  Uncontroverted evidence shows the City implemented a zero tolerance policy with regard to violence in the workplace; the City trained personnel in the elimination of violence in the workplace; and, the City developed and implemented courses for personnel on equal opportunity employment and the prohibition of sexual harassment and discrimination on the basis of race and sex in the workplace.  (Klousiadis Dec., ¶ 8).

With regard to specific complaints against Ms. Curry in the Fall of 2003, the evidence shows the City investigated the complaints and imposed discipline on Ms. Curry for unprofessional, discourteous behavior.  Further, the evidence indicates the City was instrumental in the police and administrative investigations of the alleged threats by Ms. Curry against WWTP personnel.  The City also implemented procedures physically separating Ms. Curry and the Plaintiffs, requiring all assignments from Ms. Curry to be in writing, and restructuring disciplinary decision making to require the

meting out of any workplace discipline to be resolved through private discussions between Ms. Curry and Otto Kulda, a white male.

Pursuant to this Circuit's understanding of the decisions in Faragher v. City of Boca Raton, 524 U.S. 775, 780, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 758-59, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998),  a company may be held liable for coworker harassment if its "response manifests indifference or unreasonableness in light of the facts the employer knew or should have known."  Blankenship v. Parke Care Centers, Inc., 123 F.3d 868, 873; see Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 338 (6th Cir. 2008).  Because the City implemented procedures not only separating Ms. Curry from the Plaintiffs but also elevating any disciplinary decisions to another level of management at the WWTP so as to mitigate contact and friction between Ms. Curry and the Plaintiffs, the Court finds the City's response does not demonstrate an attitude of permissiveness and indifference.  Rather, the City's actions were reasonably calculated to end Ms. Curry's alleged harassment of the Plaintiffs.

The last element of the Faragher defense requires the employer to show that the plaintiff failed to take advantage of opportunities to prevent or correct the alleged harassment.  The City satisfies this element.  The Plaintiffs acknowledge that prior to the Fall of 2003 they did not elevate their complaints about Ms. Curry to Division Head Klousiadis as directed by the implemented City policy on harassment.  Nor did the Plaintiffs report any alleged threats of violence by Ms. Curry to the Mansfield Police even though the Plaintiffs were in hourly contact with the Police Department as part of

the WWTP security procedures.  See Collette v. Stein-Mart, Inc., 126 Fed.Appx. 678, 684, 686-87 (6th Cir. 2005).

### 2.    Hostile Work Environment against Ms. Curry

Under the Ohio Civil Rights Act, unlike under Title VII, 42 U.S.C.A. § 2000e-2, an individual supervisor may be held liable for discriminatory conduct.  Genaro v. Cent. Transp., Inc., 84 Ohio St.3d 293, 300, 703 N.E.2d 782 (1999).  Thus, in this case, the Plaintiffs may sue Ms. Curry in her individual capacity for allegedly creating a hostile work environment under Ohio law, though the Plaintiffs may not do so under Title VII.

Ohio law, however, provides that a hostile work environment claim under the Ohio Civil Rights Act is generally analyzed in the same manner as one under Title VII.  Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n, 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981).  Therefore, federal case law interpreting Title VII is applicable to the Plaintiffs' Ohio law claim against Ms. Curry.

As recounted previously, while the Plaintiffs recite a series of perceived slights and abuses, many of the alleged harassing acts cannot be considered in the hostile environment analysis because the Plaintiffs have not shown that the alleged harassment was based upon their status as white males.   In Title VII actions it is important to distinguish between harassment and discriminatory harassment in order to "ensure that Title VII does not become a general civility code."  Faragher v. City of Boca Raton, 524 U.S. at 788.  While the Plaintiffs may have been subject to intimidation, ridicule, or mistreatment, in a workplace known for its course language, they have raised few instances of comments predicated on their race and gender.

-59-

The only incidents that may arguably be considered in the hostile work environment analysis are Ms. Curry's undated, and often undirected, alleged comments touching on the Plaintiffs' white race, and the undated comments about "black females" doing the Plaintiffs' jobs.  The incidents that may properly be considered are not severe or pervasive and, thus, do not meet the fourth element of the hostile environment analysis.  While the allegations are serious, they do not constitute conduct that is pervasive or severe.  See Burnett v. Tyco Corp., 203 F.3d 980, 985 (6th Cir. 2000) (holding that "under the totality of the circumstances, a single battery coupled with two merely offensive remarks over a six-month period does not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment"); Morris v. Oldham County Fiscal Court, 201 F.3d 784, 790 (6th Cir. 2000) (holding that simple teasing, offhand comments, and isolated incidents including a sexual advance did not amount to discriminatory changes in the terms and conditions of a plaintiff's employment); Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1366 (10th Cir. 1997) (holding that five incidents of allegedly sexually-oriented offensive comments during a sixteen-month period were not sufficiently frequent to create liability).

Conduct, as recounted in this action, that is "merely offensive" and "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview." Oncale, 523 U.S. at 81, 118 S. Ct. 998;  Williams v. General Motors Corp., 187 F.3d 553, 568 (6th Cir. 1999) (holding that the two-pronged test for a hostile work environment involves, first, a determination of whether a reasonable person would find the environment objectively hostile, and second, a determination of whether the plaintiff

subjectively found the hostile conduct severe or pervasive). See also Blankenship v.
Parke Care Centers, Inc., 913 F. Supp. 2d. 1045, 1050 (S.D. Ohio 1995) (holding that
the Title VII hostile work environment criteria is the same for claims brought pursuant to
O.R.C. § 4112).

Reviewing the totality of the circumstances including considerations of severity,
frequency, and workplace context, the Court does not regard Ms. Curry's alleged
comments as capable of creating a hostile work environment. Black v. Zaring Homes,
Inc., 104 F.3d 822, 825 (6th Cir.1997) ("[N]ot all workplace conduct that has sexual
overtones can be characterized as harassment forbidden by the statute [Title VII].").
Although Ms. Curry's comments may have been offensive, the Court finds her
comments neither severe nor frequent enough to render the workplace hostile for the
Plaintiffs.[17]

---

[17]Federal case law is replete with instances of course and offensive work
place behavior and commentary which, like the behavior here, is sporadic and
occasional, and did not amount to viable claims of hostile work environment.
See Black v. Zaring Homes, Inc., 104 F.3d 822, 823-24 (6th Cir. 1997) (holding
that comments directed to the plaintiff including, "Nothing I like more in the
morning than sticky buns," "Say, weren't you there [at the biker bar] Saturday
night dancing on the tables?" and "[you are] paid great money for a woman;"
references to property parcels as "Hootersville" and "Twin Peaks;" laughing when
the plaintiff pronounced a name that sounded like "bosom;" and stating "Just get
the broad to sign it," did not give rise to a sexual harassment claim); Hopkins v.
Baltimore Gas & Elec. Co., 77 F.3d 745, 747-48, 753 (4th Cir. 1996) (holding that
supervisor's alleged behavior involving actions such as bumping into employee,
kissing him at his wedding, staring at him in the bathroom, commenting on his
appearance, and making sexual remarks to him where acts occurred
intermittently and did not entail an explicit sexual proposition were insufficient to
establish hostile work environment); Baskerville v. Culligan Intl. Co., 50 F.3d
428, 430 (7th Cir. 1995) (holding that supervisor's actions-calling the plaintiff
"pretty girl," making grunting sounds when plaintiff wore a leather skirt, saying "all
pretty girls run around naked," and saying that with "so many pretty girls," he
"didn't want to lose control"-did not constitute sexual harassment); Weiss v.

### 3.    Hostile Work Environment Claim as to the Union Defendants

Plaintiffs allege that the Union Defendants share liability along with the City employer for an alleged hostile work environment under Title VII because they failed or refused to take action thereby condoning the alleged actions by the City Defendants and Ms. Curry.[18]

However, Courts do not impose liability on labor organizations for hostile work environment claims because hostile work environment claims emerge from the language of 42 U.S.C. § 2000e-2(a)(1) specifically attaching liability to employers' discriminatory actions.  Kasper v. City of Middletown, 352 F. Supp. 2d 216, 233 (D. Conn. 2005) (finding no liability against a labor organization for hostile work environment claims). The Court finds the Plaintiffs' hostile work environment claim against the Union Defendants inapplicable as a matter of law.

Even assuming a Title VII hostile work environment claim could be brought against the Union Defendants in this instance, nevertheless, the Plaintiffs' paucity of material evidence renders the claim without merit.[19]  See Harris v. Forklift Sys., supra.

---

Coca-Cola Bottling Co., 990 F.2d 333, 334-35, 337 (7th Cir. 1993) (holding that supervisor who called subordinate "dumb blond," placed "I love you" signs in her work area, asked her for a date, put his hands on her shoulder, and tried to kiss her, did not create objectively hostile environment).

[18]Without differentiating between the City entity, the named individuals and the labor organizations, Plaintiffs' Second Amended Complaint globally asserted that all Defendants harassed, imposed unjust discipline upon, threatened negative job actions upon, demeaned, defamed, and encouraged the verbal abuse of all Plaintiffs.

[19]Further, because the Plaintiffs have failed to show by a preponderance of the evidence that "intentional discrimination against the class of which plaintiff[s were members] was the company's standard operating procedure," the

-62-

First, the uncontroverted evidence indicates that the Union Defendants did bring grievance claims and met with the City in response to concerns raised by the Plaintiffs. The Local Union Defendant testified to filing grievances alleging harassment and hostile work environment even though it believed the evidence was clear that Ms. Curry's conduct was not severe or pervasive enough to merit a hostile work environment claim. Second, Plaintiffs' deposition testimony indicates that no union officials, agent or employee, of the Union Defendants have engaged in threats, harassment, discipline, defamation or encouragement of Ms. Curry's alleged abuses.  (Merritt, Depo. 349-357, 377-381; Neumann, Depo. 185-201; Jessee, Depo. 264-75; Workman, Depo. 129-31, 252-54, 273-75; Benick, Depo. 360-63, 391-94; Hout, Depo. 120-29, 263-74; Gibson, Depo. 369-95).  Third, Plaintiffs' assertion, predicated on inadmissible evidence, that the Local Union Defendant refused to assert claims of discrimination and harassment on behalf of white male employees in response to a 1996 suit brought by Ms. Curry lacks evidentiary weight.  The Plaintiffs make no showing that the Union Defendants were parties to Ms. Curry's 1996 suit.  More importantly, even if the Court were to consider Ms. Curry's 1996 suit as giving rise to a hostile work environment claim which constitutes a continuous violation, the Plaintiffs have not shown, as they must, that the violation represented the Union's standard operating procedure as intentional

---

time-line of actions considered as relevant for this matter is constrained by the 300 day statute of limitations period preceding their EEOC charges against the Union Defendants filed on 22 February 2005.  <u>Sharpe v. Cureton</u>, 319 F.3d 259 (6th Cir. 2003).  (Doc. 163; Doc 177).  Because the Plaintiffs filed their EEOC charges against the Union Defendants on 22 February 2005 no alleged acts of discrimination by the Union Defendants occurring prior to 28 April 2004 are considered timely filed.

discrimination against the class of white male employees.  <u>Sharpe</u>, <u>supra</u> at 268-69; <u>Wu v. Tyson Foods, Inc.</u>, 2006 WL 1716709 (6th Cir. 2006).

Accordingly, the Plaintiffs' hostile work environment claim against the Union Defendants will be dismissed on summary judgment as there is no genuine issue of material fact establishing that the Union Defendants engaged in conduct so objectionably offensive as to alter the working conditions of the Plaintiffs' employment either through direct action or through alleged acquiescence.


### G.    Plaintiffs 42 U.S.C. § 1983 Claim

In the Second Amended Complaint, the Plaintiffs assert that Ms. Curry's actions deprived them of their constitutional rights in violation of 42 U.S.C. § 1983.  Section 1983, provides that one who, under color of state law, deprives another of the "rights, privileges, or immunities secured by the Constitution and laws," shall be liable for damages."  Unless a deprivation of some federal constitutional or statutory right has occurred, § 1983 provides no redress even if the plaintiff's common law rights have been violated and even if the remedies available under state law are inadequate." <u>Lewellen v. Metropolitan Gov't of Nashville</u>, 34 F. 3d 345, 347 (6th Cir. 1994), <u>cert. denied</u>, 513 U.S. 1112, 115 S.Ct. 903, 130 L.Ed.2d 787 (1995).

Section1983  "... merely provides a mechanism for enforcing individual rights 'secured' elsewhere, i.e. rights independently 'secured by the Constitution and laws' of the United States.  For § 1983 by itself does not protect anyone against anything." <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 285, 122 S. Ct. 2268, 153 L. Ed.2d 309 (2002), quoting <u>Chapman v. Houston Welfare Rights Org</u>., 441 U.S. 600, 617, 99 S. Ct. 1906,

-64-

60 L. Ed.2d 508 (1979).  Section 1983 "merely provides remedies for deprivations of rights established elsewhere."  <u>Radvansky v. City of Olmsted Falls</u>, 395 F.3d 291, 301 (6th Cir. 2005).  As a remedial statute, Section 1983 creates no substantive rights but is designed to redress a violation of federal and constitutional rights.  <u>Flint v. Kentucky Dep't of Corr</u>., 270 F. 3d 340, 351 (6th Cir. 2001).

As such, where the alleged action does not implicate any federal constitutional right, Section 1983 cannot alone provide the basis for the Plaintiffs' claim.  <u>Pyles v. Raisor</u>, 60 F. 3d 1211, 1215 (6th Cir. 1995).  Here, Plaintiffs cannot prevail on any of their federal or state law claims, and thus they are unable to establish that they have been deprived of justiciable rights, privileges, and/or immunities under § 1983.

To the extent the Plaintiffs meant to attach their Section 1983 claim to the federal statutes listed in their Second Amended Complaint – Title VII and § 1981 –  then the § 1983 claim is insufficient to survive summary judgment for the reasons discussed in previous sections of this Memorandum and Order.[20]  <u>See</u> <u>Day v. Wayne Co. Bd. Of Auditors</u>, 749 F. 2d 1199 (6th Cir. 1984).

The Plaintiffs also bring two state law claims against Ms. Curry.  As averred in their Second Amended Complaint, the Plaintiffs allege damage to their reputation sounding in slander alone (Second Amended Complaint ¶ 115) and claim intentional infliction of emotional distress.  Both matters arise under state tort law and do not address federal rights or guarantees.  <u>Siegert v. Gilley</u>, 500 U.S. 226, 233 (1991).  As

---

[20]Plaintiffs generally pled their §1983 claim in conjunction with their Title VII claim.  See Second Amended Complaint, Counts I & II.

such, the Plaintiffs' state tort claims are inadequate to form the basis of a Section 1983 claim.

Against all previous evidence of their pled intentions, the Plaintiffs argue in their responsive pleadings to the Defendants' dispositive motions that they intended to couple their Section 1983 claim with the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  (Doc.  162).

The Court does not consider the Plaintiffs' Section 1983 claim properly pled in conjunction with an Equal Protection claim.  However, even if properly pled in conjunction, the Plaintiffs' Section 1983 claim is inadequate because the Plaintiffs have not alleged, nor have they provided evidence, that they were deprived of a right, privilege, or immunity secured by the Constitution or laws of the United states, a deprivation which was caused by a person acting under the color of state law.  See Harbin-Bey v. Rutter, 420 F.3d 571, 575 (6th Cir. 2005).

Thus, taking the Plaintiffs' claims regarding the City Defendants and Ms. Curry as credible, a review of the City's workplace policies and procedures forces the Court to conclude that the alleged actions by the City Defendants and Ms. Curry were not taken under color of state law but were, instead, outside of any power granted by the City. Stengel v. Belcher, 522 F. 2d 438, 441 (6th Cir. 1975).  As such, the Plaintiffs' Section 1983 claim, in conjunction with a putative Equal Protection claim, fails as a matter of law and will be dismissed through summary judgment.

-66-

**H.      Intentional Infliction of Emotional Distress, Negligent Supervision and Negligent Retention**

> **1.      Intentional Infliction of Emotional Distress Claim against all Defendants**

In Ohio, intentional infliction of emotional distress occurs when "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another."  Yeager v. Local Union 20, 6 Ohio St.3d 369, 374, 453 N.E.2d 666 (1983).  Under Yeager, it is not enough that a defendant has acted with an intent to commit a tort, a criminal act, or to inflict emotional distress, "or even that ... [a defendant's] conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."  Id.  Rather, a plaintiff must be able to show devastating injury as a consequence of intentional conduct so repugnant that it shocks the conscience:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Id. at 374-375, 453 N.E.2d 666.  Whether a defendant's conduct meets this demanding threshold is determined by the objective standards of the community, not by a particular plaintiff's subjective sensibilities.  Ullmann v. Olwine, et al., 123 F.R.D. 237, 252 (S.D. Ohio 1987).  Plaintiff must have suffered severe emotional distress and not just embarrassment or hurt feelings.  Reamsnyder v. Jaskolski, 10 Ohio St.3d 150, 264 N.E.2d 392 (1984).  Serious emotional distress is emotional injury which is both severe and debilitating.  Paugh v. Hanks, 6 Ohio St.3d 72, 78, 451 N.E.2d 759 (1983).

As an initial matter, pursuant to O.R.C. §§ 2744.02(A)(1) & .03(A)(6) the City Defendants are entitled to statutory immunity against the Plaintiffs' tort claim of intentional infliction of emotional distress.  Ohio courts have held that political subdivisions are entitled to immunity under § 2744.02 for the intentional torts committed by their employees.  See Hubbard v. Canton City School Bd. of Educ., 97 Ohio St.3d 451, 453, 780 N.E.2d 543 (2002) (affirming grant of summary judgment on claim of intentional infliction of emotional distress on immunity grounds);  Wilson v. Stark Cty. Dept. of Human Serv., 70 Ohio St.3d 450, 639 N.E.2d 105 (1994) (statute conferred immunity for intentional tort of intentional infliction of emotional distress). The City is entitled to summary judgment on this claim.

Further, the Court finds the Plaintiffs' failure to meet the prima facie case in their intentional infliction of emotional distress claim against the Union Council, Union Local and Ms. Curry, entitles these separate defendants to summary judgment on this claim. With regard to the Union Defendants, it is evident that the Plaintiffs' assertions, even if regarded as true, may prove no more than that the Union Defendants failed to exercise their duty of fair representation.  The Court has before it no evidence on behalf of the Plaintiffs to indicate outrageous or indecent conduct by any Union Defendant.  Neither do the comments by Ms. Curry, presented by the Plaintiffs,  amount to outrageous or indecent conduct as necessarily prescribed by the Ohio Supreme Court in Yeager. Instead the Court finds a municipal work site ripe with course and brutish behavior. (Neumann Depo. 290; Merritt Depo. 24).  Ms. Curry's "insults indignities [and] threats" reveal her as a participant in the boorish behavior of this particular workplace.  Yeager, 6 Ohio St. 3d at 375.  Finally, there is simply no evidence of injury.  (Neumann Depo.

222; Hout Depo. 149; Jessee Depo. 138; Benick Depo. 186-88; Gibson Depo. 35-40;

Workman Depo. 87-88)

This Court has reviewed the record evidence and concludes the facts presented

fall far short of the extreme and outrageous conduct required by the Ohio Supreme

Court in Yeager.  Thus, Plaintiffs' claim of intentional infliction of emotional distress shall

be dismissed on summary judgment against all Defendants.

## 2. Negligent Supervision and Negligent Retention Claim against the City

The Plaintiffs further claim that the City Defendants were negligent in retaining

and supervising Ms. Curry.  Negligent hiring, retention, and supervision claims under

Ohio law require proof of five elements: (1) the existence of an employment relationship;

(2) the employee's incompetence; (3) the employer's actual or constructive knowledge of

such incompetence; (4) the employee's act or omission causing plaintiff's injuries; and

(5) the employer's negligence in hiring or retaining the employee was the proximate

cause of the plaintiff's injuries.  Linder v. Am. Nat'l Ins. Co., 155 Ohio App.3d 30, 798

N.E.2d 1190, 1197 (2003).

Recent law from the 6th Circuit requires that a plaintiff also be able to establish a

tort claim against the individual employee in order to prevail in a negligent retention

claim against the employer.  See Minnich v. Cooper Farms, Inc., 39 Fed. Appx. 289, 295

(6th Cir. 2002);  Deters v. Rock-Tenn Co., Inc., 2006 WL 2711683, *13 (S.D. Ohio Sept.

21, 2006); <u>Rubin v. Ford Motor Co.</u>, 2006 WL 2128934, *7-8 (S.D. Ohio July 27, 2006).[21]


In claims for negligent hiring, retention, and supervision,  "foreseeability [is] the test of employer liability."  <u>Dawson v. Airtouch Cellular</u>, 42 F. Supp.2d 767, 772 (S.D. Ohio 1999); <u>Browning</u>, 786 N.E. 2d at 103, 104.  Where a plaintiff fails to show through evidence that the employee had any criminal or tortuous propensities, summary judgment in the employer's favor on negligent hiring and retention is proper.  <u>Id</u>. at 773; <u>see also</u> <u>Myers v. Goodwill Indus. of Akron</u>, 721 N.E.2d 130, 133 (Ohio Ct. App.1998).

In <u>Greenberg v. Life Insurance Co. of Virginia</u>, 177 F.3d 507, 517-18 (6th Cir. 1999), the Sixth Circuit interpreted the Ohio Supreme Court's decision in <u>Strock v. Pressnell</u>, 38 Ohio St.3d 207, 527 N.E.2d 1235 (Ohio 1988), to require that a plaintiff allege and prove that the employee is individually liable to the plaintiff for a tort. Further, Ohio Courts take the view that a plaintiff must be able to establish a tort claim against the individual employee in order to maintain an action for negligent supervision or retention against the employer.  <u>See</u> <u>Myers v. Goodwill Indus. of Akron, Inc.</u>, 130 Ohio App.3d 722, 721 N.E.2d 130, 134 (Ohio Ct. App.1998) (negligent retention claim against employer failed where plaintiff could not show that the employee's conduct rose to the level of intentional infliction of emotional distress); <u>Campbell v. Colley</u>, 113 Ohio App.3d 14, 680 N.E.2d 201, 206 (Ohio Ct. App.1996) (because dispatcher could not be

---

[21]This requirement is based on the following Ohio Supreme Court language: "[A]n underlying requirement in actions for negligent supervision and negligent training is that the employee is individually liable for a tort or guilty of a claimed wrong against a third person, who then seeks recovery against the employer." <u>Strock v. Pressnell</u>, 38 Ohio St.3d 207, 217, 527 N.E.2d 1235 (1988).

liable for negligence due to statutory immunity, the employer could not be liable for his negligence).

As this Court found, <u>supra</u>, the Plaintiffs have not presented sufficient evidence to create a genuine issue of material fact that Ms Curry's "insults and threats" rise to the level of intentional infliction of emotional distress, or any other tort.  Pursuant to <u>Stork</u>, the Court finds the Plaintiffs have not presented a genuine issue of material fact with regard to the negligent supervision and negligent retention claim. The Court therefore will grant summary judgment in favor of all Defendants on this claim.

Moreover, the Plaintiffs' claim that Ms. Curry was negligently retained and supervised cannot survive summary judgment because the Plaintiffs only have evidence to support the first element of the cause of action.  Plaintiffs have no evidence to suggest that Ms. Curry was incompetent or that the City Defendants knew of her alleged incompetence.  More importantly, the Plaintiffs have not identified any injury they suffered at the hands of Ms. Curry or any harmful act that she committed.  From their complaint it appears the Plaintiffs are alleging they were injured when Ms. Curry and the City Defendants discriminated against them.  However, they cannot substantiate this allegation because they failed to prove that Ms. Curry or the City Defendants discriminated against them when their Title VII, § 4112, and § 1983 claims required such proof be established.  Further, Plaintiffs have failed to show that the City Defendants' alleged negligence in hiring or retaining Ms. Curry was the proximate cause of any injury Plaintiffs sustained. Defendants are therefore entitled to summary judgment on Plaintiffs' negligent supervision and negligent retention claim.

I.      **Plaintiffs' Defamation Claim**

1.      **Defamation Claim against Ms. Curry**

The Plaintiffs allege that a number of comments by Ms. Curry amount to defamation.  In general, the Plaintiffs claim of being insulted and belittled, being cursed at, and being called liars.  Specifically, while he cannot say when these statements occurred, Mr. Workman testifies that Ms. Curry referred to him in terms such as: "lying white devil," "dumb white monkey," stupid redneck hillbilly," and "white motherfucker." (Workman Depo. 266-67).[22]  Mr. Hout testified the Ms. Curry generally referred to the Plaintiffs as "lying white devils," but admitted the comment had never been directed at him personally.  (Hout Depo. 57-58).  Further, the Plaintiffs testified that Ms. Curry commented that she "would be better off with African American female employees" and that "white male employees are worthless."  (Hout Depo. 96).  Finally, the Plaintiffs testified that Ms. Curry blamed them for damaging her car in the employee parking lot and for taking her belongings in the workplace.

In responding to the Plaintiffs' allegations Ms. Curry notes the general context of language in the workplace of the WWTP which Plaintiffs admitted was generally coarse and often laden with profanity.  (Neuman Depo. 290-91).  (Meritt Depo. 24, admitting to calling Ms. Curry "a bitch.").  Ms. Curry further argues the alleged statements are subject to a qualified privilege, that the alleged statements were predicated on inadmissible hearsay evidence, that the Plaintiffs have not suffered any damages as a

---

[22]The Court takes note that Mr. Workman was the only plaintiff to maintain an assertion that Ms. Curry insulted him multiple times.  Mr Workman's daily shift began at 11:00 p.m. and ended at 7:00 a.m., a shift that did not overlap with Ms. Curry's.  (Workman 29-30, 33-34).

result of the alleged statements, and that as expressions of opinion the alleged statements were not defamatory under Ohio law.

Under Ohio law a plaintiff alleging defamation, whether by libel or slander, must demonstrate that a defendant published defamatory and actionable statements to a third person who understood the defamatory nature of the publication.  Cooper v. Grace Baptist Church of Columbus, Ohio, Inc., 81 Ohio App.3d 728, 736, 612 N.E.2d 357, 362 (1992).   Defamation is a false publication causing injury to a person's reputation, including affecting that person adversely in a trade or business.  Snyder v. Ag Trucking, Inc., 57 F.3d 484, 489 (6th Cir. 1995).  The elements of defamation are:  (1) a false and defamatory statement, (2) unprivileged publication to a third party, (3) a requisite amount of fault on the part of the publisher, and (4) actionability or special harm caused by the statement.  Hahn v. Kotten, 43 Ohio St.2d 237, 331, 331 N.E.2d 713 (1975).

For the reasons discussed below, and pursuant to the evidence presented and Ohio jurisprudence on both qualified privilege and the publication of opinion, the Court determines that Ms. Curry is not liable for defamation as a matter of law.

### 2.     Qualified Privilege

The complaint shows, on its face, that some of the communications complained of by the Plaintiffs were communications concerning Mr. Benick or Mr. Gibson's work performance at the WWTP.  Moreover, Ms. Curry's complaints regarding missing personal items in the workplace and the alleged vandalism of her car in the employee parking lot arise out of her employment status with the WWTP.

The Court finds these statements are subject to a qualified privilege.[23]  The essential elements of a privileged communication are as follows: "(1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only."  Taylor Building Corp. of America v. Benfield, 507 F.Supp.2d 832, 841 (S.D. Ohio 2007) (citing Hahn v. Kotten, 43 Ohio St.2d at 243). " A qualified privilege is recognized in many cases where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it."  Hahn, 43 Ohio St.2d at 244.  A qualified privilege does not negate the otherwise actionable quality of the statements made.  Rather, it acts to heighten the standard of proof.  See A & B-Abell Elevator Co., 73 Ohio St.3d at 9.  A defendant otherwise protected by a qualified privilege can be held liable only if it is proven by clear and convincing evidence that he

---

[23]The Court also finds statutory immunity for Ms. Curry's alleged work related comments regarding employee competence and personal belongings at the worksite.  Ohio Revised Code Section 2744.03(A)(6) provides statutory immunity to all employees of a political subdivision unless certain exceptions apply:

> In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:
> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
> (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code....

O.R.C. § 2744.03(A)(6). The Court finds that none of the § 2744.03(A)(6) exceptions apply in this instance, entitling Ms. Curry to statutory immunity.

-74-

or she acted with actual malice.  Id. at 11-12.  "A qualified privilege protecting the making of defamatory statements is exceeded when the statements are made with 'actual malice,' that is, with knowledge that the statements are false or with reckless disregard of whether they were false or not."  Hahn, 43 Ohio St.2d 237 at syllabus ¶ 2. Simply showing that a particular statement is defamatory per se is insufficient to defeat a qualified privilege.  Ball v. British Petroleum Oil, 670 N.E.2d 289, 295 (Ohio Ct. App.1995).

The Court determines Ms. Curry's statements directed at the Plaintiffs regarding workplace competence and her comments regarding her concerns for the safety of her personal belongings at the worksite fall under the liability protection of qualified privilege. Further, the Court does not find clear and convincing evidence that Ms. Curry acted with actual malice in uttering those comments.   Jacobs v. Frank, 60 Ohio St.3d 111 (1991). Under Ohio law a finding of malice, bad faith, or recklessness requires something more than negligence or gross negligence.  Jones v. City of Cincinnati, 2006 WL 2987820, * 16 (S.D. Ohio Oct. 17, 2006).  In defining what constitutes recklessness in the context of defamation, the Sixth Circuit stated that a defendant employee's "[m]ere failure to verify [the truth of a statement] may constitute negligence but is not sufficient to support a finding of reckless misconduct" in the absence of evidence that the employee doubted the truth of his statements.  O'Hara v. Board of Educ. of Brooklyn City Sch. Dist., 72 F. App'x 311, 314 (6th Cir. 2003).

Accordingly, the Court finds the Plaintiffs have not met the heightened standard of proof required to show that Ms. Curry's statements regarding her concerns for the

safety of her personal belongings at the worksite were defamatory. See Taylor Building Corp. of America v. Benfield, 507 F.Supp.2d at 841.

### 3. Defamation and the Publication of Opinion

Further, Ms. Curry argues that the statements are not defamatory because they are not "false statements," but rather opinions. With regard to the balance of Ms. Curry's statements, the Court agrees.

Whether or not a statement is an opinion is a question of law for the Court. Scott v. News-Herald, 25 Ohio St.3d 243, 250, 496 N.E.2d 699 (1986); Wampler v. Higgins, 93 Ohio St.3d 111, 117-120, 752 N.E.2d 962 (2001). Under Ohio law, the protection of opinions from liability is a form of privilege, and privilege issues generally present legal questions for the Court. Wampler, 93 Ohio St.3d at 126-27, 752 N.E.2d 962. Accordingly, it is appropriate to decide these issues in the context of a motion pursuant to Rule 56.

The standards under Ohio law for analyzing whether statements express opinions or facts were established by the following three cases: Scott v. News-Herald, 25 Ohio St.3d 243, 496 N.E.2d 699 (1986); Vail v. Plain Dealer Publishing Co., 72 Ohio St.3d 279, 649 N.E.2d 182 (1995), cert. denied, 516 U.S. 1043, 116 S.Ct. 700, 133 L.Ed.2d 657 (1996); and Wampler v. Higgins, 93 Ohio St.3d 111, 752 N.E.2d 962 (2001).

In Scott the Ohio Supreme Court found the defendants' statements were not actionable as defamation. The Court stated that the analysis of whether a statement expresses a false fact or opinion must be based on the totality of the circumstances, focusing on the following four factors: (1) the specific language used; (2) whether the

statement is verifiable; (3) the written context of the statement; and (4) the broader social context in which the statement is made. Scott at 250, 496 N.E.2d 699.

The Ohio Supreme Court continues to hold that the Ohio Constitution provides protection independent of the First Amendment, and recognizes the Scott analysis as the method for analyzing defamation claims. See Wampler v. Higgins, 93 Ohio St.3d 111, 117-120, 752 N.E.2d 962 (2001). In Wampler, the Court further held that the Scott analysis applies to all defamation claims, not just those involving media defendants. 93 Ohio St.3d at 120-25, 752 N.E.2d 962.

Because the Scott analysis applies to the Plaintiffs' defamation claim, the Court must decide, under the totality of the circumstances, whether the statements at issue express facts or opinions using the following four factors: (1) the specific language used; (2) whether the statement is verifiable; (3) the written context of the statement; and (4) the broader social context in which the statement is made. In weighing these factors, the Court views the statements from the standpoint of a reasonable person, and does not consider the subjective intent of the author, or in this instance, the speaker. McKimm, 89 Ohio St.3d at 144-45, 729 N.E.2d 364.

The first factor is the specific language used. The words used are to be afforded their common and ordinary meaning. Scott, 25 Ohio St.3d at 250, 496 N.E.2d 699; Wampler, 93 Ohio St.3d at 127, 752 N.E.2d 962. The Court must consider whether the words used normally convey information of a factual nature, or hype and opinion. Words lacking precise meaning ordinarily are not actionable.

The second factor is whether the statements are verifiable. A statement is deemed verifiable if: (1) the speaker represents that she has knowledge or evidence that

-77-

substantiates the statements, and (2) there is a plausible method to verify the statements.  <u>Scott</u>, 25 Ohio St.3d at 251-52, 496 N.E.2d 699.

The third factor is the context of the statements, which requires consideration of the alleged defamation in the context of other accompanying statements.  Important is the tenor, including whether the statements appear as characterized by objective facts or subjective hyperbole. <u>Vail</u>, 72 Ohio St. at 282, 74 N.E. 183.  <u>See also</u>, <u>Stepien v. Franklin</u>, 39 Ohio App.3d 47, 528 N.E.2d 1324 (Ohio App.,1988)  (noting the arena of sports is "a traditional haven for cajoling, invective, and hyperbole," and therefore the reasonable reader was on notice that referring to the appellant as  "stupid," "dumb," "buffoon," "nincompoop," "scum," "a cancer," "an obscenity," "gutless liar," "unmitigated liar," "pathological liar," "egomaniac," "nuts," "crazy," "irrational," "suicidal," "lunatic," was a statement of opinion).

Fourth, the Court must consider the broader social context in which the statements appear.  Under this factor, the Court considers the type of writing and the placement of the statements: "different types of writing have ... widely varying social conventions which signal to the reader the likelihood of a statement's being either fact or opinion [citations omitted]." <u>Scott</u>, 25 Ohio St.3d at 253, 496 N.E.2d 699.

Upon review of Ms. Curry's alleged statements, the Court notes the tenor of the statements as enveloped in figurative hyperbole.  In context, a reasonable person overhearing the statements would view the comments as utterances of the author's subjective characterizations, and not as reliable, verifiable facts. Here, Ms. Curry's statements were uttered during the course of a workday at the WWTP.  A reasonable

-78-

reader would not view the blanket, unexplained statements at issue as "facts" when placed in such forum.

Accordingly, under the totality of the circumstances, the Court concludes that the Scott factors require dismissal of the Plaintiffs' defamation complaint against Ms. Curry.


### 4.    Defamation Claim Against the Union Defendants

The Plaintiffs also assert that the Union Defendants uttered defamatory statements which besmirched their reputations.  Specifically, the Plaintiffs point to comments by Dale Blamer, representative of the Local Union that the Plaintiffs' case was "all about money," that the Plaintiffs should "not be afraid of a girl," that their case was "bullshit," and that the "WWTP ran better without Hout."  Further, the Plaintiffs accuse Union staff representative Brad Miller of telling Mr. Benick that Mr. Jessee was "a liar."

Before addressing these allegations, the Court will note as inadmissible hearsay, the Plaintiffs' further claims of an unnamed Union board member's reference to the Plaintiffs as the "Shithouse 7" and Mr. Blamer's alleged suggestion to unnamed employees that gift certificates given to Union members would have been more generous were it not for this suit.

For the reasons set forth above, in the previous analysis of the decision in Scott, the Court finds that Mr. Blamer and Mr. Miller were expressing personal opinion. Moreover, in averring defamation against the Union Defendants the Plaintiffs must establish actual malice.  Dale v. Ohio Civil Service Employees Ass'n., 57 Ohio St. 3d 112, 118 567 N.E. 2d 253, 258 (1991).  The evidence offered by the Plaintiffs is

insufficient to meet their burden of showing actual malice.   New York Times Co. v. Sullivan, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed.2d 686 (1964).

**IV.    CONCLUSION**

For the foregoing reasons, the Union Defendants' motion to strike (Doc. 178) is granted and the Union Defendants' expedited motion to strike is declared moot (Doc. 171).   Finally, the Defendants' separate summary judgment motions (Docs. 137, 141, 142) are granted and the Plaintiffs' claims are dismissed as a matter of law in their entirety pursuant to Fed. R. Civ. Pr. 56.


IT IS SO ORDERED.


  /s/Lesley Wells
UNITED STATES DISTRICT JUDGE